United States Courts
Southern District of Texas
FILED

JUN 0 7 2005

Michael N. Milby, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| RICHARD TIM BOYCE, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. 04cv2587 (Consolidated) |
| Plaintiff, | Judge Keith P. Ellison |
| vs. | |
| AIM MANAGEMENT GROUP, INC., et al., | |
| Defendants. | |

## CONSOLIDATED AMENDED COMPLAINT

1.      Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included interviews with persons with knowledge of the conduct complained of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media reports, news articles, academic literature and academic studies.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### I.      NATURE OF THE ACTION

2.      Plaintiffs bring this action as a class action on behalf of shareholders in mutual funds belonging to the AIM Advisors, Inc. ("AIM") and INVESCO Funds Group, Inc. ("INVESCO") families of mutual funds, including AIM and INVESCO mutual funds (collectively, the "AIM/INVESCO Funds"), and derivatively on behalf of the AIM/INVESCO Funds, against the AIM/INVESCO Funds' investment advisers, corporate parents and directors.

3.      This Complaint alleges that the Investment Adviser Defendants (as defined herein) drew upon the assets of the AIM/INVESCO Fund shareholders to pay brokers to aggressively push AIM/INVESCO Funds, and that the Investment Adviser Defendants concealed such payments from shareholders by disguising them as brokerage commissions. Such brokerage commissions, though payable from shareholders' assets, are not disclosed to shareholders in the AIM/INVESCO Funds public filings or elsewhere.

4.      Thus, AIM/INVESCO Fund shareholders purchased AIM/INVESCO Funds from brokers who received undisclosed payments from the Investment Adviser Defendants to push AIM/INVESCO Funds over other mutual funds and who, therefore, had undisclosed conflicts of interest. Then, once invested in one or more of the AIM/INVESCO Funds, AIM/INVESCO Fund shareholders were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push AIM/INVESCO Funds to other brokerage clients.

5.      The Investment Adviser Defendants were motivated to make these secret payments to finance the improper marketing of AIM/INVESCO Funds because their fees were calculated as a percentage of funds under management and, therefore, tended to increase as the number of AIM/INVESCO Fund shareholders grew. The Investment Adviser Defendants attempted to justify this conduct on the ground that by increasing the AIM/INVESCO Funds assets they were creating economies of scale that inured to the benefit of shareholders but, in truth and in fact, AIM/INVESCO Fund shareholders received none of the benefits of these purported economies of scale. Rather, fees and costs associated with the AIM/INVESCO Funds increased during the Class Period (as defined herein), in large part because the Investment Adviser Defendants continued to skim from the AIM/INVESCO Fund shareholders to finance their ongoing aggressive marketing campaign.

6.     Defendants were motivated to engage in this hidden plan of charging excessive fees to AIM/INVESCO Fund shareholders to capitalize on inducing brokers to steer shareholders into AIM/INVESCO Funds. The fees defendants collected for managing and advising the AIM/INVESCO Funds were calculated as a percentage of the Funds' value and, therefore, increased as the assets invested in the AIM/INVESCO Funds grew. While the AIM/INVESCO investment advisers and their affiliates thus benefited from the increase in Fund assets, neither the Funds nor the Fund shareholders benefited from expanding the size of the Funds.

7.     Defendants' practice of charging excessive fees, commissions and expenses to AIM/INVESCO Fund shareholders to pay and induce brokers to steer investors into AIM/INVESCO Funds necessarily created material insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but, in fact, were only concerned with their pay-offs from the AIM/INVESCO investment advisers and their affiliates.

8.     The practice of charging excessive fees and commissions also created material and insurmountable conflicts of interest for the investment advisers to the AIM/INVESCO Funds who had a duty to act in the best interests of fund shareholders, but were, in fact, primarily concerned with siphoning fees from AIM/INVESCO Fund shareholders to induce brokers to increase artificially the amount of investment in AIM/INVESCO Funds.

9.     The AIM/INVESCO Funds directors, who purported to be watchdogs for AIM/INVESCO Fund shareholders, permitted this conduct to occur. Although each AIM/INVESCO Fund was nominally governed by a Board of Directors[1] ("Board") throughout the Class Period, these directors were selected and nominated not by the shareholders of the funds themselves, but by AIM and INVESCO. These individuals served on multiple fund boards

---

[1] As used herein, "director" means either director or trustee, as applicable, consistent with Investment Company Act Section 2(a)(12), 15 U.S.C. § 80a-2(a)(12).

advised by AIM and INVESCO and owed their positions, along with the substantial compensation they received as a result, to AIM and INVESCO. As a result, these directors suffered from disabling conflicts of interest that precluded them from discharging their fiduciary duties of care, loyalty, good faith and candor, which should have included enforcing AIM and INVESCO's various stated policies related to the collection and distribution of fees as described to AIM/INVESCO Fund shareholders in various documents, including AIM/INVESCO Funds Annual Reports, Semi-Annual Reports and Prospectuses, and otherwise acting to safeguard the best interests of innocent shareholders in the AIM/INVESCO Funds, including Plaintiffs.

10.     Recently, as a result of the conduct complained of herein, the mutual fund industry has been the subject of intense regulatory scrutiny and regulatory action. On January 28, 2004, the *Los Angeles Times* published an article about a Senate committee hearing on mutual fund abuses which stated, in pertinent part:

> "The mutual fund industry is indeed the world's largest skimming operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the panel, comparing the scandal-plagued industry to "a $7-trillion trough" exploited by fund managers, brokers and other insiders.

Jonathan Peterson, *Markets; Senate Panel Chides Fund Industry*, Los Angeles Times, January 28, 2004, at C4.

11.     Along these lines, the interests of AIM/INVESCO Fund shareholders were subordinated to those of the AIM/INVESCO investment advisers and their affiliates during the Class Period. In fact, in a September 7, 2004 press release issued in connection with a $400 million settlement, ***including a $75 million reduction in fees***, between governmental regulators and AMVESCAP PLC subsidiaries INVESCO and AIM stemming from other misconduct with respect to the AIM/INVESCO Funds by defendants, Charles W. Brady, Executive Chairman of AMVESCAP PLC, confessed that AIM/INVESCO Fund shareholders' interests had been

disregarded in favor of the interests of AMVESCAP PLC, and its subsidiaries during the Class
Period:

> "We deeply regret *the harm done to fund shareholders. . . . Our
> fundamental commitment has been − and must continue to be −
> to uphold our clients' trust by putting their interests first.* It has
> been painful for AMVESCAP employees at all levels to learn that
> *these core values were not always upheld, impacting our
> customers* and damaging the reputation of our company."

Press Release, AMVESCAP, AMVESCAP PLC Announces Agreements With SEC, New York,

Colorado, Georgia (Sept. 7, 2004) (on file with author), *available at* http://www.aiminvestments

.com/pdf/AMVESCAP_message_090704.pdf (emphasis added).

12. Indeed, defendants - as operators and overseers of the AIM/INVESCO Funds -

are currently the subject of widespread and intensive regulatory investigations related to

excessive or improper advisory and distribution fees and mutual fund sales practices, including

revenue sharing and directed brokerage arrangements. Among the governmental regulators

investigating INVESCO and/or AIM and certain of their affiliates and/or officers for the

practices detailed throughout the Complaint are: the SEC, the NASD, Inc. ("NASD"), the

Florida Department of Financial Services, the Attorney General of the State of West Virginia, the

West Virginia Securities Commission, the Bureau of Securities of the State of New Jersey, the

United States Department of Labor ("DOL"), the Department of Banking for the State of

Connecticut, the Internal Revenue Service, the United States Attorney's Office for the Southern

District of New York, the United States Attorney's Office for the Central District of California,

the United States Attorney's Office for the District of Massachusetts, the Massachusetts

Securities Division, the U.S. Postal Inspection Service and the Commodity Futures Trading

Commission. *See* AIM Advisors, Inc., *Settled Enforcement Actions and Investigations Related*

*to Market Timing* (2005), *available at* http://www.aiminvestments.com/navigation/gateway ?CGI_PATH=/pdf/litigationsummary_050305.pdf.

13. By engaging in the conduct alleged herein, AIM and INVESCO, and the defendant entities that control and support them, during the period between March 11, 1999 and May 10, 2004, inclusive, (the "Class Period") breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), breached their common law fiduciary duties to a class ("Class") of all persons or entities who held one or more shares or other ownership units of AIM/INVESCO Funds, as set forth in Appendix A attached hereto. Defendants also violated Section 34(b) of the Investment Company Act because, to further their improper campaign and increase their profits, they made material omissions and untrue statements of material fact in fund registration statements and other AIM/INVESCO Fund documents filed with the SEC and provided to shareholders with respect to the procedure for determining the amount of fees payable to AIM and INVESCO and with respect to the improper uses to which the fees were put. Additionally, the AIM/INVESCO Funds Directors breached their common law fiduciary duties to the AIM/INVESCO Fund shareholders by allowing the improper conduct alleged herein to occur and harm AIM/INVESCO Fund shareholders.

## II.    **JURISDICTION AND VENUE**

14. The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15, and common law.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. § 80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14; and 28 U.S.C. §§ 1331, 1337, 1391(b). This action is also brought under the doctrine of pendant and supplemental jurisdiction.

16.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendants AIM Management Group Inc. and AIM were at all relevant times, and still are, headquartered in this District.

17.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

**A.     Plaintiffs**

18.     Plaintiff Joy D. Beasley ("Beasley") held during the Class Period and continues to own shares or units of the AIM Basic Value Fund and has been damaged by the conduct alleged herein.

19.     Plaintiff Sheila McDaid ("McDaid") held during the Class Period and continues to own shares or units of the INVESCO Technology Fund and has been damaged by the conduct alleged herein.

20.     Plaintiff City of Chicago Deferred Compensation Plan ("Chicago") is a municipal deferred compensation plan located in Chicago, Illinois. Chicago was formed pursuant to Section 457 of the United States Internal Revenue Code (26 U.S.C. § 457) for the benefit of the

current and retired employees of the City of Chicago and their beneficiaries. Chicago held during the Class Period shares or units of the INVESCO Dynamics Fund and the AIM Constellation Fund and has been damaged by the conduct alleged herein.

21. Plaintiff Richard Tim Boyce ("Boyce") held during the Class Period shares or units of the AIM European Fund (f/k/a INVESCO European Fund) and has been damaged by the conduct alleged herein.

22. Plaintiff Robert P. Apa ("R. Apa") held during the Class Period and continues to own shares or units of the AIM European Growth Fund, AIM Group Value Fund, and AIM Weingarten Fund and has been damaged by the conduct alleged herein.

23. Plaintiff Suzanne K. Apa ("S. Apa") held during the Class Period and continues to own shares or units of the AIM European Growth Fund and has been damaged by the conduct alleged herein.

24. Plaintiff Marina Berti ("Berti") held during the Class Period shares or units of the AIM Premier Equity Fund and AIM Mid Cap Core Equity Fund and has been damaged by the conduct alleged herein.

25. Plaintiff Khanh Dinh ("Dinh") held during the Class Period shares or units of the AIM Constellation Fund and has been damaged by the conduct alleged herein.

26. Plaintiff Frank Kendrick ("Kendrick") held during the Class Period shares or units of the AIM Weingarten Fund and AIM Basic Value Fund, and has been damaged by the conduct alleged herein.

27. Plaintiff Edward A. Krezel ("Krezel") held during the Class Period shares or units of the AIM Basic Value Fund and has been damaged by the conduct alleged herein.

28. Plaintiff Dan B. Lesiuk ("Lesiuk") held during the Class Period shares or units of the AIM Basic Value Fund and has been damaged by the conduct alleged herein.

29.    Plaintiff John B. Perkins ("Perkins") held during the Class Period and continues to own shares or units of the AIM Basic Value Fund and has been damaged by the conduct alleged herein.

30.    Plaintiff J. Doris Willson ("Willson") held during the Class Period shares or units of the AIM Premier Equity Fund and INVESCO Dynamics Fund, and has been damaged by the conduct alleged herein.

31.    Plaintiff Robert W. Wood ("Wood") held during the Class Period shares or units of the AIM Select Equity Fund and has been damaged by the conduct alleged herein.

32.    Plaintiff Bob J. Fry ("B. Fry") held during the Class Period shares or units of the INVESCO Worldwide Communications Fund, INVESCO European Fund and INVESCO Telecommunications Fund, and has been damaged by the conduct alleged herein.

33.    Plaintiff Janice R. Fry ("J. Fry") held during the Class Period shares or units of the INVESCO Telecommunications Fund, INVESCO European Fund, INVESCO Financial Services Fund, INVESCO Health Sciences Fund, INVESCO Worldwide Communications Fund, and INVESCO Technology Fund, and has been damaged by the conduct alleged herein.

34.    Plaintiff James P. Hayes ("Hayes") held during the Class Period shares or units of the AIM Aggressive Growth Fund, AIM Global Aggressive Growth Fund, AIM Group Value Fund, AIM Capital Development Fund, AIM Charter Fund and AIM Group Income Fund, and has been damaged by the conduct alleged herein.

35.    Plaintiff Virginia L. Magbual ("Magbual") held during the Class Period shares or units of the INVESCO Leisure Fund and has been damaged by the conduct alleged herein.

36.    Plaintiff Henry W. Meyer ("Meyer") held during the Class Period shares or units of the AIM Balanced Fund, AIM Constellation Fund and AIM Large Cap Growth Fund, and has been damaged by the conduct alleged herein.

37.     Plaintiff George Robert Perry ("Perry") held during the Class Period shares or units of the INVESCO Financial Services Fund and has been damaged by the conduct alleged herein.

38.     Plaintiff Harvey R. Bendix ("Bendix") held during the Class Period and continues to own shares or units of the INVESCO Leisure Fund and has been damaged by the conduct alleged herein.

39.     Plaintiff Cvetan Georgiev ("Georgiev") held during the Class Period and continues to own shares or units of the AIM VI Capital Appreciation Fund and has been damaged by the conduct alleged herein.

40.     Plaintiff David M. Lucoff ("Lucoff") held during the Class Period shares or units of the AIM Basic Value Fund and the AIM Constellation Fund and continues to own shares or units of the AIM Capital Development Fund, and has been damaged by the conduct alleged herein.

41.     Plaintiff Michael E. Parmalee, Trustee of the Herman S. and Esperanza A. Drayer Residual Trust U/A 4/22/83, ("Drayer Residual Trust") held during the Class Period shares or units of the AIM Floating Rate Fund and has been damaged by the conduct alleged herein.

42.     Plaintiff Stanley S. Stephenson, Trustee of the Stanley J. Stephenson Trust, ("Stephenson Trust") held during the Class Period shares or units of the AIM Limited Maturity Treasury Fund and has been damaged by the conduct alleged herein.

43.     Plaintiff Kehlbeck Trust Dtd 1-25-93, Billy B. Kehlbeck and Donna J. Kehlbeck, TTEES, ("Kehlbeck Trust") held during the Class Period shares or units of the AIM Large Cap Growth Fund and the AIM Blue Chip Fund, and has been damaged by the conduct alleged herein.

**B.      The AIM/INVESCO Defendants**

44.      Nonparty AMVESCAP PLC is one of the largest independent global investment managers in the world, with more than $375 billion in assets under management as of March 31, 2005.  AMVESCAP PLC is the ultimate parent of defendants AIM, INVESCO and AIM Management Group Inc.

45.      Defendant AIM Management Group Inc. ("AMG") is an affiliate of AMVESCAP PLC and the parent company of AIM.  AMG is located at 11 Greenway Plaza, Suite 100, Houston, TX 77046.

### 1.      The Investment Adviser Defendants

46.      Defendant INVESCO is an indirect wholly-owned subsidiary of AMVESCAP PLC located at 4350 S. Monaco Street, Denver, Colorado 80237, and was at all relevant times the investment adviser to the INVESCO Funds.  INVESCO collected during the Class Period various forms of compensation for "managing" and "advising" the INVESCO Funds, including millions of dollars in advisory, distribution, 12b-1 and other fees as a percentage of assets under management.

(a)      On November 25, 2003, AIM succeeded INVESCO as the investment adviser to the INVESCO Funds other than INVESCO Variable Investment Funds, Inc. ("IVIF").  AIM replaced INVESCO as the adviser for IVIF in April 2004.

(b)      As a result of the transition of investment adviser for the INVESCO Funds from INVESCO to AIM, as of October 15, 2004 each of the INVESCO Funds that is the subject of this action was re-branded as an AIM Fund, as set forth in Appendix A.  According to a *Washington Post* article entitled "Problems? Try A New Name; Some Funds Look To Change The Way Investors See Them," dated September 17, 2004, the INVESCO name was dropped

11

principally because of the immense negative publicity generated by the scandals in which INVESCO has been involved and the related regulatory investigations and settlements.

47.     Defendant AIM serves as investment adviser to, among other entities, the AIM/INVESCO Funds.  AIM collected during the Class Period, and continues to collect, various forms of compensation for "managing" and "advising" the AIM Funds, including millions of dollars in advisory, distribution, 12b-1 and other fees as a percentage of assets under management.  For example, during the fiscal year 2003, AIM received compensation of approximately .67% of average daily net assets under management for advisory fees alone. AIM, together with its subsidiaries, managed or advised over 155 funds or portfolios, including over 70 "retail" funds with $131 billion in assets under management as of March 31, 2005.  AIM is located at 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

48.     INVESCO and AIM are referred to collectively herein as the "Investment Adviser Defendants."

49.     The Investment Adviser Defendants are registered as investment advisers under the Investment Advisers Act.  Fees payable to the Investment Adviser Defendants are calculated as a percentage of fund assets under management.

50.     Throughout the Class Period, the Investment Adviser Defendants, and/or their subsidiaries or affiliates, were responsible for performing virtually all critical functions and the day-to-day management of the AIM/INVESCO Funds, including: (i) selling shares in the funds to the public; (ii) performing all "back-office" operations; (iii) determining the Net Asset Value ("NAV") of the funds on a daily basis; (iv) directing and controlling the investments in the funds; (v) ensuring that the investment policies of the funds are observed; (vi) enforcing the policies of the funds, including activities that could be detrimental to fund shareholders; and (vii) otherwise managing the day-to-day activities of the funds.

12

### 2. **The Distributor Defendants**

51.     Defendant AIM Distributors, Inc. ("ADI"), a private subsidiary of AMG and a broker-dealer registered with the SEC, serves as the principal underwriter of each of the AIM/INVESCO Funds and was paid fees out of the assets of the AIM Funds during the Class Period. ADI is located at 11 Greenway Plaza, Suite 800, Houston, Texas 77046.

52.     Defendant INVESCO Distributors, Inc. ("IDI") is a wholly-owned subsidiary of INVESCO. IDI is a broker-dealer registered with the SEC and served as the principal underwriter of each the INVESCO Funds and was paid fees out of the assets of the INVESCO Funds during the Class Period. IDI is located at 4350 South Monaco Street, Denver, Colorado 80237.

53.     ADI and IDI are collectively referred to herein as the "Distributor Defendants."

### 3. **Nominal Defendants: The AIM/INVESCO Funds**

54.     The Nominal Defendants are the AIM/INVESCO Funds, as identified in the list annexed hereto as Appendix A, and all trusts and corporations that comprised the AIM/INVESCO Funds that were advised and managed by INVESCO and/or AIM during the Class Period. The Nominal Defendants are named as such to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

55.     The AIM/INVESCO Funds offer multiple classes of shares, with each class representing a *pro rata* interest in each AIM/INVESCO Fund. AIM/INVESCO Fund shares are issued to AIM/INVESCO Fund shareholders pursuant to Prospectuses that must comply with the federal securities laws, including the Investment Company Act. All of the Prospectuses are substantially the same on the matters relevant to this litigation.

56.     All of the AIM/INVESCO Funds are alter egos of one another. The AIM/INVESCO Funds are essentially pools of investor assets that are managed and administered by a common body of officers and employees of AIM and/or INVESCO who administer the AIM/INVESCO Funds generally. The AIM/INVESCO Funds have no independent will and are totally dominated by the Investment Adviser Defendants and the common body of directors established by Investment Adviser Defendants. Thus, in substance, the AIM/INVESCO Funds function as components of one unitary organization.

57.     All AIM/INVESCO Funds throughout the Class Period shared the same affiliated companies as their investment advisers and shared either IDI or ADI as their principal underwriter and distributor. Currently, all of the AIM/INVESCO Funds share the same investment adviser, AIM, and the same distributor, ADI. Additionally, the defendants pool together fees and expenses collected from the AIM/INVESCO Fund shareholders, and as a result the AIM/INVESCO Funds share expenses with one another.

**4.     The Director Defendants**

58.     Each of the AIM/INVESCO Funds had, during the Class Period, a Board charged with representing the interests of the shareholders in one or a series of the AIM/INVESCO Funds. The members of those Boards are, as defined herein, the Director Defendants. The AIM Director Defendants and the INVESCO Director Defendants, as defined immediately below, are referred to collectively herein as the "Director Defendants."

**(a)     The AIM Director Defendants**

59.     The following defendants were directors of the AIM Funds and/or the trusts or entities that consisted of the AIM Funds during the Class Period:

(a)     Defendant Robert H. Graham ("Graham") was a director and Chairman of AMG during the Class Period. Graham is an interested person of the AIM/INVESCO Funds

14

within the meaning of Investment Company Act Section 2(a)(19)(A) (15 U.S.C. § 80a-2(a)(19)(A)) because he is also a director of AMVESCAP PLC, the parent of the AIM and AMG.

> (b)     Defendant Mark H. Williamson ("Williamson") was a director, President and Chief Executive Officer ("CEO") of AMG during the Class Period. Williamson was also CEO of INVESCO and IDI during the Class Period. Williamson is an interested person of the AIM/INVESCO Funds within the meaning of Investment Company Act Section 2(a)(19)(A) (15 U.S.C. § 80a-2(a)(19)(A)) because he is also an officer and director of AIM and AMG.

> (c)     Defendant Frank S. Bayley ("Bayley") was a director during the Class Period. Bayley received compensation totaling $150,000 for the year ended December 31, 2002.

> (d)     Defendant Bruce L. Crockett ("Crockett") was a director during the Class Period. Crockett received compensation totaling $149,000 for the year ended December 31, 2002.

> (e)     Defendant Albert R. Dowden ("Dowden") was a director during the Class Period. Dowden received compensation totaling $150,000 for the year ended December 31, 2002.

> (f)     Defendant Edward K. Dunn, Jr. ("Dunn") was a director during the Class Period. Dunn received compensation totaling $149,000 for the year ended December 31, 2002.

> (g)     Defendant Jack M. Fields ("Fields") was a director during the Class Period. Fields received compensation totaling $153,000 for the year ended December 31, 2002.

> (h)     Defendant Carl Frischling ("Frischling") was a director during the Class Period. Frischling received compensation totaling $150,000 for the year ended December 31, 2002.

(i)     Defendant Prema Mathai-Davis ("Mathai-Davis") was a director during the Class Period. Mathai-Davis received compensation totaling $150,000 for the year ended December 31, 2002.

(j)     Defendant Lewis F. Pennock ("Pennock") was a director during the Class Period. Pennock received compensation totaling $154,000 for the year ended December 31, 2002.

(k)     Defendant Ruth H. Quigley ("Quigley") was a director during the Class Period. Quigley received compensation totaling $153,000 for the year ended December 31, 2002.

(l)     Defendant Louis S. Sklar ("Sklar") was a director during the Class Period. Sklar received compensation totaling $153,000 for the year ended December 31, 2002.

(m)     Defendants Graham, Williamson, Bayley, Crockett, Dowden, Dunn, Fields, Frischling, Mathai-Davis, Pennock, Quigley, and Sklar are referred to collectively herein as the "AIM Director Defendants." As of May 2004, each of the AIM Director Defendants oversaw at least 112 separate AIM/INVESCO Funds or "portfolios." The AIM Director Defendants' business address is 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

**(b)     The INVESCO Director Defendants**

60.     The following defendants were directors of the INVESCO Funds and/or the trusts or entities that consisted of the INVESCO Funds during the Class Period:

(a)     Defendant Fred A. Deering ("Deering") was Vice Chairman of the Board during the Class Period. Deering also served as a member of the Executive, Audit, Valuation, Legal, Insurance, and Nominating Committees during the Class Period. During the fiscal year ended July 31, 2002, Deering received compensation totaling $116,000.

(b)  Defendant Victor L. Andrews, Ph.D. ("Andrews") was a director during the Class Period. Andrews also served as a member of the Investments and Management Liaison, Derivatives, Compensation, and Retirement Plan Committees during the Class Period. During the fiscal year ended July 31, 2002, Andrews received compensation totaling $99,700.

(c)  Defendant Bob R. Baker ("Baker") was a director during the Class Period. Baker also served as a member of the Executive, Valuation, Investments and Management Liaison, Brokerage, Nominating, Compensation, and Retirement Plan Committees during the Class Period. During the fiscal year ended July 31, 2002, Baker received compensation totaling $102,700.

(d)  Defendant Lawrence H. Budner ("Budner") was a director during the Class Period. Budner also served as a member of the Audit, Brokerage, Compensation, and Retirement Plan Committees during the Class Period. During the fiscal year ended July 31, 2002, Budner received compensation totaling $98,700.

(e)  Defendant James T. Bunch ("Bunch") was a director during the Class Period. Bunch also served as a member of the Investments and Management Liaison, Brokerage, and Nominating Committees during the Class Period. During the fiscal year ended July 31, 2002, Bunch received compensation totaling $92,350.

(f)  Defendant Gerald J. Lewis ("Lewis") was a director during the Class Period. Lewis also served as a member of the Audit, Derivatives, and Legal Committees during the Class Period. During the fiscal year ended July 31, 2002, Lewis received compensation totaling $95,350.

(g)  Defendant John W. McIntyre ("McIntyre") was a director during the Class Period. McIntyre also served as a member of the Executive, Audit, Valuation, Brokerage, and

17

Legal Committees during the Class Period. During the fiscal year ended July 31, 2002, McIntyre received compensation totaling $117,050.

(h)     Defendant Larry Soll, Ph.D. ("Soll") was a director during the Class Period. Soll also served as a member of the Investments and Management Liaison, Derivatives, Nominating, Compensation, and Retirement Plan Committees during the Class Period. During the fiscal year ended July 31, 2002, Soll received compensation totaling $111,900.

(i)     Defendants Deering, Andrews, Baker, Budner, Bunch, Lewis, McIntyre and Soll are referred to collectively herein as the "INVESCO Director Defendants." As of May 2004, each of the INVESCO Director Defendants oversaw at least 112 separate AIM/INVESCO Funds or "portfolios." The INVESCO Director Defendants' business address is 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

**5.     The John Doe Defendants**

61.     Defendants John Does 1-100 were AIM/INVESCO directors or officers during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsel's ongoing investigation.

**IV.     SUBSTANTIVE ALLEGATIONS**

62.     Unbeknownst to Plaintiffs and other members of the Class, throughout the Class Period, defendants used the assets of AIM/INVESCO Fund shareholders to pay kickbacks to various brokerages and participate in "shelf space" programs at the brokerages in furtherance of their own, undisclosed agenda and to the detriment of the Class. As alleged in detail below, defendants employed several different means to increase their profits by, among other wrongful practices: (1) increasing the amount of fees they were able to retain by shifting fees, expenses and commissions to AIM/INVESCO Fund shareholders; and (2) enticing third-party brokers to

18

increase sales of AIM/INVESCO Funds, using money paid by current shareholders, thereby

increasing the amount of assets under management and profits the Investment Adviser

Defendants and their affiliates could reap with no corresponding benefits to the AIM/INVESCO

Fund shareholders.

### The November 17, 2003 Announcement

63.     On November 17, 2003, these practices began to come to light when the SEC

issued a press release (the "November 17 SEC Release") in which it announced a $50 million

settlement of an enforcement action against Morgan Stanley Dean Witter relating to improper

mutual fund sales practices.  The AIM Funds were subsequently identified as one of the mutual

fund families that Morgan Stanley brokers were paid to promote.  In this regard, the release

announced:

> the institution and simultaneous settlement of an enforcement
> action against Morgan Stanley DW Inc. (Morgan Stanley) for
> failing to provide customers important information relating to their
> purchases of mutual fund shares.  As part of the settlement,
> Morgan Stanley will pay $50 million in disgorgement and
> penalties, all of which will be placed in a Fair Fund for distribution
> to certain Morgan Stanley customers.
>
> *Stemming from the SEC's ongoing industry-wide investigation of
> mutual fund sales practices, this inquiry uncovered two distinct,
> firm-wide disclosure failures by Morgan Stanley. The first relates
> to Morgan Stanley's "Partners Program" and its predecessor, in
> which a select group of mutual fund complexes paid Morgan
> Stanley substantial fees for preferred marketing of their funds.*
> To incentivize its sales force to recommend the purchase of shares
> in these "preferred" funds, Morgan Stanley paid increased
> compensation to individual registered representatives and branch
> managers on sales of those funds' shares.  *The fund complexes
> paid these fees in cash or in the form of portfolio brokerage
> commissions.*

*See* Press Release, U.S. Securities and Exchange Commission, SEC Charges Morgan Stanley

With Inadequate Disclosure in Mutual Fund Sales (Nov. 17, 2003) (on file with author),

*available at* http://www.sec.gov/news/press/2003-159.htm.  (Emphasis added.)

64.     The November 17 SEC Release further stated:

The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: *"Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives – in the form of "shelf space" payments – to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction."*

Morgan Stanley has agreed to settle this matter, without admitting or denying the findings in the Commission's Order. As part of the settlement, Morgan Stanley will pay $25 million in disgorgement and prejudgment interest. In addition, Morgan Stanley will pay civil penalties totaling $25 million.

In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; [and] (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes; [. . . .]

Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

\*       \*       \*       \*

The NASD also announced today a settled action against Morgan Stanley for violations of NASD Rule 2830(k) arising from the Partners Program and its predecessor.

*Id.* (Emphasis added.)

20

65.     In fact, the NASD issued a news release, titled "NASD Charges Morgan Stanley

with Giving Preferential Treatment to Certain Mutual Funds in Exchange for Brokerage

Commission Payments" (the "November 17 NASD News Release"), which explained that:

> Morgan Stanley operated two programs - the Asset Retention
> Program and the Partners Program - in which it gave favorable
> treatment to products offered by as many as 16 mutual fund
> companies out of a total of over 115 fund complexes that could be
> sold by the firm's sales force. In return for these brokerage
> commissions and other payments, mutual fund companies received
> preferential treatment by Morgan Stanley...
>
> *This conduct violated NASD's "Anti-Reciprocal Rule," Conduct
> Rule 2830(k), which prohibits members from favoring the
> distribution of shares of particular mutual funds on the basis of
> brokerage commissions to be paid by the mutual fund companies,
> as well as allowing sales personnel to share in directed brokerage
> commissions. One important purpose of the rule is to help
> eliminate conflicts of interest in the sale of mutual funds.*

*Available at* http://www.nasd.com/web/idcplg?IdcService=SS_GET_PAGE&ssDocName

=NASDW_002819&ssSOurceNodeId=1108 (emphasis added).

66.     On November 18, 2003, *The Washington Post* published an article entitled

"Morgan Stanley Settles With SEC, NASD; Firm Accused of Failing to Disclose Funds'

Payments."  The article states in relevant part:

> *Investors who bought mutual funds from Morgan Stanley, the
> nation's second-largest securities firm, didn't know that the
> company was taking secret payments from some fund companies
> to promote their products,* according to allegations that resulted in
> a $50 million settlement agreement yesterday with the Securities
> and Exchange Commission.
>
> In many cases, those same investors were actually footing the bill,
> indirectly, for the slanted recommendations, the SEC said.  Some
> of the 16 fund companies whose products were pushed by Morgan
> brokers paid for the marketing help by letting Morgan handle some
> of their stock and bond trading. *The millions of dollars in
> commissions earned by Morgan on that trading came out of
> mutual fund share owners' profits,* according to the SEC.

                    *       *       *       *

21

> *Morgan said yesterday that companies in its "Partners Program"*
> *included AIM Management Group Inc., . . .*

(Emphasis added.)

67.    On November 24, 2003, the *Chicago Sun-Times* published an article entitled

"Investor 'bill of rights' doesn't go far enough." The article states, "Morgan Stanley's bill of

rights reveals the company receives special payments from 16 funds groups.... Such payments

provide these firms with "greater access" to Morgan Stanley's brokers, with all the fishiness that

implies."

68.    Also, on January 14, 2004, *The Wall Street Journal* published an article under the

headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers." Citing "a person

familiar with the investigation," the article notes that the SEC is "close to filing its first charges

against mutual-fund companies related to arrangements that direct trading commissions to

brokerage firms that favor those fund companies' products." The article stated in pertinent part

as follows:

> *The SEC has been investigating the business arrangements between*
> *fund companies and brokerage houses since last spring.* It held a news
> conference yesterday to announce *that it has found widespread evidence*
> *that brokerage houses steered investors to certain mutual funds because*
> *of payments they received from fund companies or their investment*
> *advisers as part of sales agreements.*
>
> Officials said the agency has opened investigations into eight brokerage
> houses and a dozen mutual funds that engaged in a longstanding practice
> known as "revenue sharing." Agency officials said they expect that
> number to increase as its probe expands. They declined to name either the
> funds or the brokerage houses.
>
> The SEC said payments varied between 0.05% and 0.4% of sales and as
> much as 0.25% of assets that remained invested in the fund. [. . .]
>
> \*       \*       \*
>
> *People familiar with the investigations say regulators are looking into*
> *examples of conflicts of interest when fund companies use shareholder*
> *money to cover the costs of sales agreements instead of paying the sales*

> *costs out of the firms' own pockets. The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements. In other cases, the SEC is investigating whether funds violated policies that require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.*

*Id.* (Emphasis added.)

### Defendants Negotiated and Profited From Improper "Shelf Space" Arrangements

69.     The conflicts of interest and harm to AIM/INVESCO Fund shareholders evidenced by AIM and INVESCO's relationship to Morgan Stanley are paradigmatic of other conflicts of interest and harmful arrangements entered into by defendants. Throughout the Class Period, AIM had entered into various other *quid pro quo* arrangements with various broker-dealers. Below are just a handful of those broker-dealers with whom AIM and AMG had established improper arrangements to push AIM Funds.

70.     FSC Securities Corporation represents financial advisors under the AIG group umbrella. The firm's September 14, 2004 "FSC Disclosure Document for Mutual Fund and Variable Annuity Shareholders" indicates that that AIM participated in "shelf space" arrangements with FSC. *See* http://www.fscorp.com/EPProgramDisclosure.pdf. According to the FSC Disclosure Document, AIM paid FSC an amount "in addition to the customary sales charges in connection with sales of mutual funds." *Id.* FSC Securities also disclosed that their individual brokers, as well as FSC Securities, are compensated by AIM such that it "may create an incentive for representatives to sell such funds." *Id.* Furthermore, on sales of AIM Funds, FSC brokers did not have to pay a ticket charge, further increasing their compensation.

71.     FSC Securities disclosed that it also received compensation in the form of 12b-1 fees: "12b-1 fees are payments made by a mutual fund in connection with a distribution of its securities. The fund company takes 12b-1 fees out of the fund's assets each year for marketing

23

and distribution expenses, which *may include compensating representatives*." *Id.* (Emphasis added.)

72.    In a June 2004 press release on the Smith Barney website entitled "Mutual Funds, Revenue Sharing Fund Families" Smith Barney, a division of Citigroup Global Markets Inc., identified that the AIM Funds made payments to Smith Barney as part of a "shelf space" arrangement. *See* http://www.smithbarney.com/products_services/mutual_funds/investor _information/revenueshare.html.

73.    On its website, National Planning Holdings, Inc. ("NPH"), a full service broker/dealer, revealed that it had "entered into agreements" with AIM "who provide the BDs [broker/dealers] with marketing and other services and who also provide the BDs with additional compensation." *See* http://www.siionline.com/public/sii_disclosure.pdf. As a result, AIM paid NPH's brokers up to 40 basis points (.4%) on gross sales of AIM Funds. In addition, AIM paid up to 5 basis points (.05%) on the amount of AIM assets under management by NPH brokers on an annual basis. Finally, AIM paid NPH *a minimum of $500,000 per year* under the program.

74.    Wachovia Securities has also identified on its website that it received payments from AIM as part of a "shelf space" arrangement. *See* http://www.wachovia.com/files /Mutual_Fund_Guide2.pdf.

**Improper Use of Revenue-Sharing, Directed Brokerage and Excessive Commissions**

75.    The Investment Adviser Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into AIM/INVESCO Funds as part of the many *quid pro quo* "shelf space" arrangements between AIM and INVESCO and various brokerage firms. Such payments were used to fund sales contests and other undisclosed financial incentives to further push AIM/INVESCO Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to AIM/INVESCO Funds regardless of the

Funds' investment quality relative to other investment alternatives and to thereby breach their

duties of loyalty. As described by the National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses
> commissions payable for executing the fund's securities trades to
> obtain a preferred position for the fund in the broker-dealer's
> distribution network. This practice creates numerous potential
> conflicts of interest, including possible incentives for broker-
> dealers to base their fund recommendations to customers on
> brokerage commission considerations rather than on whether a
> particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

76.     By paying the excessive commissions and directing brokerage business to

participate in "shelf space" programs, the Investment Adviser Defendants violated Section 12 of

the Investment Company Act, because such payments were not made pursuant to a valid Rule

12b-1 plan. Additionally, in several actions to date against brokerage firms and mutual fund

advisors, the SEC, the NASD and various other government regulators have made it clear that

the undisclosed use of excessive commissions and directed brokerage to participate in "shelf

space" programs − as AIM and INVESCO have done here − are highly improper.

77.     The SEC has expressed serious concerns regarding the significant conflicts of

interest inherent in revenue-sharing programs and has mandated that proper disclosure must be

made. Specifically, the SEC has stated that "[r]evenue sharing arrangements not only pose

potential conflicts of interest, but also may have the indirect effect of reducing investors' returns

by increasing the distribution-related costs incurred by funds. Even though revenue sharing is

paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is

possible that some advisers may seek to increase the advisory fees that they charge the fund to

finance those distribution activities . . . . Moreover, revenue sharing arrangements may prevent

some advisers from reducing their current advisory fees." 69 Fed. Reg. 6438, 6441, n.21

(February 10, 2004). The Morgan Stanley revenue sharing programs that the SEC declared improper included both cash payments made ostensibly by the distributor or adviser, as well as payments through directed brokerage.

78. The SEC has brought actions against other mutual fund companies for the same type of behavior complained about here. As established in a recent Administrative Proceeding against Massachusetts Financial Services, Inc. ("MFS") for similar practices complained of herein:

> **MFS Did Not Adequately Disclose to MFS Shareholders that it Allocated Fund Brokerage Commissions to Satisfy Strategic Alliances.**
>
> *     *     *
>
> Specifically, Item 16(c) of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."
>
> *     *     *
>
> **The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to allocate specific negotiated amounts of fund brokerage commissions, subject to best execution, to broker-dealers for "shelf space" or heightened visibility within their distribution systems.**

*See* March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions against MFS, File No. 3-11450, *available at* http://www.sec.gov/litigation/admin/ia-2224.htm. (Emphasis added.)

79. Similarly, in its Administrative Proceeding against Morgan Stanley, the SEC explained:

> At issue in this matter are two distinct disclosure failures. The first relates to Morgan Stanley DW's operation of mutual fund

> marketing programs in which it collected from a select group
> of mutual fund complexes amounts in excess of standard sales
> loads and Rule 12b-1 trail payments. These programs were
> designed to specially promote the sale of those mutual funds
> with enhanced compensation to individual registered
> representatives, known as financial advisors ("FAs"), and
> branch managers as well as increased visibility in its extensive
> retail distribution network.

*See* November 17, 2003 Morgan Stanley SEC Cease-and-Desist Order, File No. 3-11335,

*available at* http://www.sec.gov/litigation/admin/33-8339.htm (footnote omitted). (Emphasis

added.)

    80.    On September 15, 2004, mutual fund advisor PIMCO and its affiliates entered

into a settlement with the SEC. Similar to the allegations in this Complaint against AIM and

INVESCO, the SEC charged PIMCO entities with failing to disclose their use of directed

brokerage to pay for "shelf space" at brokerage firms. The Press Release stated:

> The Securities and Exchange Commission announced today a
> settled enforcement action against the investment adviser, sub-
> adviser, and principal underwriter and distributor for the PIMCO
> Funds Multi-Manager Series funds (the PIMCO MMS Funds). The
> suit charges the entities with **failing to disclose to the PIMCO
> MMS Funds' Board of Trustees and shareholders material
> facts and conflicts of interest that arose from their use of
> directed brokerage on the PIMCO MMS Funds' portfolio
> transactions to pay for "shelf space" arrangements with
> selected broker-dealers.**
>
>            *     *     *
>
> Stephen M. Cutler, Director of the SEC's Division of Enforcement,
> stated, "An investment adviser's undisclosed use of mutual fund
> assets to defray the adviser's, or an affiliated distributor's, own
> marketing expenses is a breach of the adviser's duty. Our action
> today — like the action brought by the Commission against
> Massachusetts Financial Services Company some six months ago
> — demonstrates the Commission's resolve to ensure that mutual
> fund shareholders know how their money is being spent."

*See* Press Release, U.S. Securities and Exchange Commission, SEC Charges Pimco Entities with

Failing to Disclose Their Use of Directed Brokerage to Pay for Shelf Space at Brokerage Firms,

(Sept. 15, 2004) (on file with author), *available at* http://www.sec.gov/new/press/2004-130.htm (emphasis added).

81. On December 13, 2004, the SEC announced a settlement of charges against mutual fund investment adviser Franklin Advisers, Inc. and Franklin Templeton Distributors (collectively "Franklin") "alleging that Franklin, without proper disclosure, used fund assets to compensate brokerage firms for recommending the Franklin Templeton mutual funds over others to their clients." The SEC press release continued:

> This practice is known as compensating brokerage firms for "shelf space." As part of the settlement, Franklin agreed to pay $1 in disgorgement and a $20 million penalty as well as undergo certain compliance reforms.
>
> *      *      *
>
> The use of brokerage commissions to compensate brokerage firms for marketing created a conflict of interest between FA and the funds because FA benefited from the increased management fees resulting from increased fund sales. Mutual funds that follow this practice of using brokerage commissions for marketing have an incentive to do their fund portfolio trading through brokerage firms that might not be the best choice for fund shareholders. FA was required, but failed, to disclose adequately the arrangements to the boards so they could approve this use of fund assets, and to shareholders so they could be informed when making investment decisions.

*See* Press Release, U.S. Securities and Exchange Commission, Franklin Advisers and Franklin Templeton Distributors to Pay $20 Million to Settle Charges Related to Use of Brokerage Commissions to Pay for Shelf Space, (Dec. 13, 2004) (on file with author), *available at* http://www.sec.gov/news/press/2004-168.htm.

82. On December 22, 2004, the SEC, NASD, and NYSE announced settled enforcement proceedings against Edward D. Jones & Co., L.P. ("Edward Jones") "related to allegations that Edward Jones failed to adequately disclose revenue-sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its

customers." As part of the settlement, Edward Jones paid $75 million in disgorgement and civil

penalties. The press release continued:

> Linda Chatman Thomsen, Deputy Director of the Commission's
> Division of Enforcement, said, "Edward Jones' undisclosed receipt
> of revenue sharing payments from a select group of mutual fund
> families created a conflict of interest. When customers purchase
> mutual funds, they should be told about the full nature and extent
> of any conflict of interest that may affect the transaction. Edward
> Jones failed to do that."
>
>      *    *    *
>
> In NASD's separate settlement, in addition to the receipt of direct
> revenue sharing payments, NASD found that the firm gave
> preferential treatment to the Preferred Funds in exchange for
> millions of dollars in directed brokerage from three of the
> Preferred Fund families. This violates NASD's 'Anti-Reciprocal
> Rule," Conduct Rule 2830(k), which prohibits regulated firms
> from favoring the distribution of shares of particular mutual funds
> on the basis of brokerage commissions to be paid by the fund
> companies.

*See* Press Release, U.S. Securities and Exchange Commission, Edward Jones to Pay $75 Million

to Settle Revenue Sharing Charges, (Dec. 22, 2004) (on file with author), *available at*

http://www.sec.gov/news/press/2004-177.htm.

  83.   Further illustrating that the NASD views revenue-sharing programs as improper

and impermissible, a February 16, 2005 press release regarding the NASD's filing of a complaint

against American Funds Distributors states:

> American Funds Distributors, Inc. [ ] violat[ed] NASD's Anti-
> Reciprocal Rule by directing approximately $100 million in
> brokerage commissions over a three-year period to about 50
> brokerage firms that were the top sellers of American Funds.
>
>      *    *    *
>
> The commissions were payments for executing trades for the
> American Funds' portfolio that were directed to the brokerage
> firms *as additional compensation for past sales of American Funds*,
> and to ensure that American Funds would continue to receive
> preferential treatment at those firms.

* * *

> "Prior cases in this area have focused on retail firms that received directed brokerage payments from mutual fund companies in exchange for giving preferential treatment to their funds," said NASD Vice Chairman Mary L. Schapiro. ***"Today's action makes clear that it is just as impermissible to offer and make such payments as it is to receive them."***

*See* News Release, NASD Press Room, NASD Charges American Fund Distributors, Inc. With Arranging $100 Million in Directed Brokerage Commissions for Top Sellers of American Funds, (Feb. 16, 2005) (on file with author), *available at* http://www.nasd.com/web/idcplg?IdcService =SS_GET_PAGE&ssDocName=NASDW_013358 (emphasis added).

84.     The undisclosed excessive commissions and directed brokerage business used by defendants, and considered improper by the SEC as noted above, did not fund any services that benefited the AIM/INVESCO Funds' shareholders.  These practices materially harmed Plaintiffs and other members of each Class from whom the illegitimate and improper fees were taken.

### The Investment Adviser Defendants Secretly Paid Excessive Commissions To Brokers To Steer Clients To AIM/INVESCO Funds

85.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act of 1934 ("Securities Exchange Act") (15 U.S.C. § 78bb(e)(1)) carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades.  Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined ***in good faith*** that the amount of the commission is reasonable in relation to

the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1). (Emphasis added.) In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, any service that "provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, 51 F.R. 16004 (April 30, 1986). The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

86.    The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) "safe harbor." The Investment Adviser Defendants paid excessive commissions to broker dealers on top of any real Soft Dollars to steer their clients to AIM/INVESCO Funds and directed brokerage business to firms that favored AIM/INVESCO Funds. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push AIM/INVESCO Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to AIM/INVESCO Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage commissions, the Investment Adviser Defendants additionally violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 Plan.

87.    The excessive commissions did not fund any services that benefited the AIM/INVESCO Fund shareholders. This practice materially harmed Plaintiffs and other members of each Class from whom the Soft Dollars and excessive commissions were taken.

### The Investment Adviser Defendants Used
### Rule 12b-1 Marketing Fees For Improper Purposes

88.     Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act,

prohibits mutual funds from directly or indirectly distributing or marketing their own shares

unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-1 conditions

require that payments for marketing must be made pursuant to a written plan "describing all

material aspects of the proposed financing of distribution."  This means that all agreements with

any person relating to implementation of the plan must be in writing, the plan must be approved

by a vote of the majority of the board of directors and the board of directors must review, at least

quarterly, "a written report of the amounts so expended and the purposes for which such

expenditures were made."  Additionally, the directors "have a duty to request and evaluate, and

any person who is a party to any agreement with such company relating to such plan shall have a

duty to furnish, such information as may reasonably be necessary to an informed determination

of whether such plan should be implemented or continued."  The directors may continue the plan

"only if the [board of] directors who vote to approve such implementation or continuation

conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties

under state law and sections 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that *there is a*

*reasonable likelihood that the plan will benefit the company and its shareholders."* (Emphasis

added.)

89.     The exceptions to the Section 12b prohibition on mutual fund marketing were

enacted in 1980 under the theory that the marketing of mutual funds, all things being equal,

should be encouraged because increased investment in mutual funds would presumably result in

economies of scale, the benefits of which would be shifted from fund managers to shareholders.

During the Class Period, the Director Defendants authorized, and the Investment Adviser

Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

90.     However, the Rule 12b-1 fees charged to AIM/INVESCO Fund shareholders were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund shareholders increased, the economies of scale thereby created, if any, were not passed on to AIM/INVESCO Fund shareholders. Rather, AIM/INVESCO Funds management and other fees increased and this was a red flag that the Director Defendants knowingly or recklessly disregarded. If anything, the AIM/INVESCO Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Director Defendants reviewed written reports of the amounts expended pursuant to the AIM/INVESCO Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required – which seems highly unlikely under the circumstances set forth herein – the Director Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing AIM/INVESCO Fund shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective AIM/INVESCO Fund shareholders.

91.     As set forth herein, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the AIM/INVESCO Funds Rule 12b-1 Plan.

**The Director Defendants Breached Their**
**Fiduciary Duties To AIM/INVESCO Funds Shareholders**

92.      Mutual fund Boards of Directors have a duty to protect investors and closely

guard the fees paid to an investment adviser and guarantee that they are not excessive and that

the investment adviser is acting in the best interest of the mutual fund shareholders.  As

explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual

Funds Directors Forum:

> The Board of Directors of a mutual fund has significant
> responsibility to protect investors.  By law, directors generally are
> responsible for the oversight of all of the operations of a mutual
> fund.  In addition, under the Investment Company Act, directors
> are assigned key responsibilities, such as negotiating and
> evaluating the reasonableness of advisory and other fees, selecting
> the fund's independent accountants, valuing certain securities held
> by the fund, and managing certain operational conflicts.
>
> The role of fund directors is particularly critical in the mutual fund
> context because almost all funds are organized and operated by
> external money-management firms, thereby creating inherent
> conflicts of interest and potential for abuse.  Money-management
> firms operating mutual funds want to maximize their profits
> through fees provided by the funds, bur the fees, of course, paid to
> these firms, reduce the returns to fund investors.
>
> Independent directors, in particular, should serve as "independent
> watchdogs" guarding investors' interests – and helping to protect
> fund assets from uses that will be of primary benefit to
> management companies.  These interests must be paramount, for it
> is the investors who own the funds and for whose sole benefit they
> must be operated.

*See* http://www.sec.gov/news/speech/spch010704whd.htm.

93.      The Investment Company Institute ("ICI"), of which AIM and INVESCO are

members, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain
> convenient access to a professionally managed and diversified portfolio of
> investments. [. . .]

34

> *Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the fund's investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing that directors oversee the advisers who manage and service their investments.*
>
> *In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.*

(Emphasis added.)[2]

94.     Recognizing the danger of mismanagement related to fees charged to mutual fund shareholders, Congress imposed various duties on mutual funds and their board members in an attempt to protect shareholders, including Section 15(c) of the Investment Company Act, which provides:

> It [is] the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

95.     However, the Boards of the AIM/INVESCO Funds failed to fulfill their duties. In truth and in fact, INVESCO and AIM's Boards, *i.e.*, the Director Defendants, were captive to and controlled by INVESCO and AIM respectively, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the AIM/INVESCO Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming AIM/INVESCO Fund shareholders' assets. In many cases,

---

[2]  The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, as of June, 2005, its membership included approximately 8,000 mutual funds, 600 closed-end funds, 143 exchange-traded funds, and five sponsors of unit investment trusts. Its mutual fund members have 87.7 million individual shareholders and manage approximately $8 trillion in investor assets. The quotation above is excerpted from a paper entitled *Understanding the Role of Mutual Fund Directors*, available on the ICI website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

key AIM/INVESCO Funds Directors were employees or former employees of the Investment Adviser Defendants and were beholden for their positions, not to AIM/INVESCO Fund shareholders, but, rather, to the Investment Adviser Defendants they were supposed to oversee. The Director Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed purportedly independent committees, charged with responsibility for billions of dollars of AIM/INVESCO Fund assets (comprised largely of shareholders' college and retirement savings).

96.     To ensure that the Director Defendants were compliant, the Investment Adviser Defendants often recruited key Director Defendants from the ranks of investment adviser companies and paid them excessive salaries for their service as directors. For example, Graham, the Chairman and director of AMG, is also the director and/or trustee of various registered investment companies in the AIM Fund complex.

97.     In exchange for creating and managing the AIM/INVESCO Funds, including the AIM/INVESCO Funds purchased and held by Plaintiffs, the Investment Adviser Defendants charged the AIM/INVESCO Funds a variety of fees, each of which was calculated as a percentage of assets under management. Hence, the more money invested in the funds, the greater the fees paid to INVESCO and AMG. In theory, the fees charged to fund shareholders are negotiated at arm's-length between the fund Board and the investment management company and must be approved by the independent members of the Board. However, as a result of the Director Defendants' dependence on the Investment Adviser Defendants for their position and their failure to properly manage the investment advisers, millions of dollars in AIM/INVESCO Funds assets were transferred through fees payable from AIM/INVESCO Funds assets to the Investment Adviser Defendants that were of no benefit to fund shareholders.

98.     As a result of these practices, the mutual fund industry was enormously profitable

for INVESCO and AIM. However, AIM and INVESCO's profits at the expense of

AIM/INVESCO Fund shareholders remained unchecked by the Director Defendants throughout

the Class Period. In this regard, a *Forbes* article entitled "The Great Fund Failure," published on

September 15, 2003, stated:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the
> financial industry overall; [...]
>
>       *         *         *
>
> *Economies of scale?  This is a business made for them − but, . . .
> the customers don't see the benefit.  The [mutual fund] business
> grew 71-fold (20-fold in real terms) in the two decades through
> 1999, yet costs as a percentage of assets somehow managed to go
> up 29%.*
>
>       *         *         *         *
>
> *[F]und vendors have a way of stacking their boards with rubber
> stamps.*  As famed investor Warren Buffett opines in Berkshire
> Hathaway's 2002 annual report: "Tens of thousands of independent
> directors, over more than six decades, have failed miserably."  A
> genuinely independent board would occasionally fire an
> incompetent or overcharging fund adviser.  That happens just
> about never.  Buffett: "A monkey will type out a Shakespearean
> play before an independent mutual fund director will suggest [it]."

(Emphasis added.)

## AIM FUNDS

99.     AIM public filings state that the Board for each AIM trust consisting of the AIM

Funds is responsible for the management and supervision of each respective Fund.  In this

regard, the May 2, 2003 Statement of Additional Information for funds offered by the AIM

Growth Series (the "AIM Statement of Additional Information"), is typical of the Statements of

Additional Information published for other AIM/INVESCO Funds.  It states that "The Board of

Trustees approves all significant agreements between the Trust, on behalf of one or more of the

Funds, and persons or companies furnishing services to the Funds. The day-to-day operations of each Fund are delegated to the officers of the Trust and to AIM, subject always to the objective(s), restrictions and policies of the applicable Fund and to the general supervision of the Board of Trustees." *See* AIM Statement of Additional Information for AIM Growth Series, Form 497, filed May 2, 2003 at 21-22.

100. Moreover, the AIM Statement of Additional Information also sets forth in greater detail the purported process by which the investment managers are selected and the advisory contracts are approved:

> The advisory agreement with AIM was re-approved for each Fund by the Trust's Board . . . . In evaluating the fairness and reasonableness of the advisory agreement, the ***Board of Trustees considered a variety of factors for each Fund,*** including: ***the requirements of each Fund for investment supervisory and administrative services; the quality of AIM's services, including a review of each Fund's investment performance and AIM's investment personnel; the size of the fees in relationship to the extent and quality of the investment advisory services rendered; fees charged to AIM's other clients; fees charged by competitive investment advisors; the size of the fees in light of services provided other than investment advisory services***; the expenses ***borne by each Fund as a percentage of its assets and relationship to contractual limitations***; any fee waivers (or payments of Fund expenses) by AIM; AIM's profitability; ***the benefits received by AIM from its relationship to each Fund, including soft dollar arrangements, and the extent to which each Fund shares in those benefits***; the organizational capabilities and financial condition of AIM and conditions and trends prevailing in the economy, the securities markets and the mutual fund industry; and the historical relationship between each Fund and AIM.

*Id.* at 24. (Emphasis added.)

**INVESCO Funds**

101. INVESCO public filings during the Class Period stated that the Board for each INVESCO trust consisting of the INVESCO Funds was responsible for the management and supervision of each respective Fund. In this regard, the INVESCO Statement of Additional

38

Information for INVESCO Sector Series dated August 1, 2002 (the "INVESCO Statement of

Additional Information"), is typical of the Statements of Additional Information available for

other AIM/INVESCO Funds.  It states that "The overall direction and supervision of the

Company come from the board of directors.  The board of directors is responsible for making

sure that the Funds' general investment policies and programs are carried out and that the Funds

are properly administered."

102.    Moreover, the INVESCO Statement of Additional Information stated, with

respect to the duties of the Directors, as follows:

> *In approving the Advisory Agreement, the board primarily*
> *considered, with respect to each Fund, the nature, quality, and*
> *extent of the services provided under the Agreement and the*
> *overall fairness of the Agreement.*  The board requested and
> evaluated information from INVESCO that addressed specific
> factors designed to assist in the board's consideration of these
> issues.

*Id.*  (Emphasis added.)

103.    The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment managers are selected:

> With respect to the nature and quality of the services provided, the
> board reviewed, among other things (1) the overall performance
> results of the Funds in comparison to relevant indices, (2) a
> summary for each Fund of the performance of a peer group of
> investment companies pursuing broadly similar strategies prepared
> by an independent data service, and (3) the degree of risk
> undertaken by INVESCO as reflected by a risk/return summary,
> also prepared by the independent data service.  The board
> considered INVESCO's resources and responsiveness with respect
> to Funds that have experienced performance difficulties and
> discussed the efforts being made to improve the performance
> records of such Funds.  *The board also considered the advantages*
> *to each Fund of having an advisor that is associated with a*
> *global investment management organization.  In connection with*
> *its review of the quality of the execution of the Funds' trades, the*
> *board considered INVESCO's use in fund transactions of*
> *brokers or dealers that provided  research and other services to*

39

*INVESCO or its affiliates, and the benefits derived from such services to the Funds and to INVESCO.* The board also considered the quality of the shareholder and administrative services provided by INVESCO, as well as the firm's positive compliance history.

With respect to the overall fairness of the Agreement, *the board primarily considered the fairness of fee arrangements and the profitability and any fall-out benefits of INVESCO and its affiliates from their association with the Funds.* The board reviewed information from an independent data service about the rates of compensation paid to investment advisors and overall expense ratios, for funds comparable in size, character, and investment strategy to the Funds. In concluding that the benefits accruing to INVESCO and its affiliates by virtue of their relationships with the Funds were reasonable in comparison with the costs of providing investment advisory services and the benefits accruing to each Fund, the board reviewed specific data as to INVESCO's profit or loss on each Fund, and carefully examined INVESCO's cost allocation methodology. In this connection, the board requested that the Funds' independent auditors review INVESCO's methodology for appropriateness. *The board concluded that approval of the Agreement was in the best interest of the Funds' shareholders.* These matters were considered by the Independent Directors working with experienced 1940 Act counsel that is independent of INVESCO.

*Id.* (Emphasis added.)

### The AIM/INVESCO Funds' Prospectuses, Annual Reports And Semi-Annual Reports Were Materially False And Misleading

104. Plaintiffs and other members of each Class were entitled to, and did receive, one or more of the Prospectuses, pursuant to which the AIM/INVESCO Funds shares were offered, as well as Annual and Semi-Annual Reports. Each of these documents contained substantially the same material omissions and materially false and misleading statements regarding 12b-1 fees, "shelf space" arrangements, commissions and Soft Dollars.

105. Prospectuses are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. Section 34(b) of the Investment Company Act, *inter alia*, requires that