## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| RICHARD TIM BOYCE, Individually And On Behalf Of All Others Similarly Situated,<br><br>  Plaintiff,<br><br>vs.<br><br>AIM MANAGEMENT GROUP, INC., et al.,<br><br>  Defendants. | Civil Action No. 04cv2587 (Consolidated)<br><br>Judge Keith P. Ellison |

### SECOND CONSOLIDATED AMENDED COMPLAINT

1.      Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included interviews with persons with knowledge of the conduct complained of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media reports, news articles, academic literature and academic studies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### INTRODUCTION

2.      This is a federal class action based upon the wrongdoing by Defendants AIM Management Group Inc. and AIM Advisors, Inc. ("AIM"), and INVESCO Funds Group, Inc. ("INVESCO") (collectively, "AIM/INVESCO"), and its subsidiaries and affiliates also named herein as Defendants, in charging excessive fees and commissions and failing adequately to disclose that they siphoned assets belonging to investors in AIM mutual funds and/or INVESCO mutual funds (collectively, "AIM/INVESCO Funds" or "Funds") in order to improperly pay and induce brokers to steer investors into AIM/INVESCO Funds. As a result of the excessiveness of

1

the fees charged to investors and the material omissions and conduct detailed below, Defendants

are liable: 1) under the Investment Company Act of 1940 (the "Investment Company Act") to a

class (the "Class") of all persons or entities who held one or more shares, units or like interests of

AIM/INVESCO Funds, set forth in Exhibit A hereto, during the period March 11, 1999 to May

10, 2004, inclusive (the "Class Period"); and 2) for unjust enrichment, and breaches of their

common law fiduciary duties, to a sub-class (the "State Law Sub-Class" or the "Sub-Class") of

all persons or entities who acquired one or more shares, units or like interests of AIM/INVESCO

Funds before March 11, 1999 and held during the Class Period. The State Law Sub-Class

excludes any persons with transactions that constitute a "purchase" within the meaning of the

Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f), including

any dividend reinvestments during the Class Period. Plaintiffs also bring a separate derivative

claim under the Investment Advisers Act of 1940 (the "Investment Advisers Act").

     3.     The investment adviser fees, administrative fees, 12b-1 fees and director[1]

compensation received by Defendants for managing AIM/INVESCO mutual funds and charged

to the AIM/INVESCO investors were excessive. These fees were used to finance revenue

sharing and directed brokerage relationships that would increase mutual fund sales significantly

and created significant economies of scale. These economies of scale were not passed on to

investors, but instead resulted in increased profit margins for the investment advisers. In light of

the economies of scale that solely benefited Defendants, the fees were so disproportionately large

that they bore no reasonable relationship to the services rendered. The investment advisers

(defined below) took advantage of the lack of transparency in the fee structure and their

influence over the Funds' directors to ensure that their fees continued to rise even though the

---

[1] As used herein, "director" means either director or trustee, as applicable, consistent with
Investment Company Act Section 2(a)(12), 15 U.S.C. § 80a-2(a)(12).

services they provided remained the same and the investment advisers and brokerage firms were the only parties benefiting from the economies of scale. The investment advisers used investor assets, such as excessive investment adviser fees, directed brokerage commissions and distribution fees, to pay for their own out-of-pocket expenses and to further relationships with brokers that only benefited themselves and their affiliates, as described below.

4. Although an increase in Fund assets should benefit investors due to economies of scale that decrease expenses, these benefits were enjoyed solely by Defendants. As the Funds grew, Defendants failed to pass on the benefits of the economies of scale – decreased costs and expenses – to AIM/INVESCO shareholders. In fact, although Defendants' fees were increasing with the size of the Funds, the services provided by Defendants did not increase. Accordingly, the sole purpose of the fees charged to the Funds investors by Defendants was to expand the size of the Funds to profit Defendants, but no benefit accrued to their investors from those fees. Thus, the fees were excessive and Defendants breached their fiduciary duties by charging such fees (the true purposes for which were undisclosed to investors) and receiving the benefits therefrom.

5. The excessiveness of the fees is best shown by comparing how the significant increases in fees did not correlate to changes in services provided to the Funds investors. For example, although the dollar amount of the advisory and 12b-1 fees has expanded dramatically, the nature and quality of the services provided did not change, and the aggregate costs of operation did not increase in proportion to the increase in fees and were essentially fixed.

6. The practice of charging excessive fees and commissions created an insurmountable conflict of interest for the investment advisers to the AIM/INVESCO Funds who had a duty to act in the best interests of Fund investors, but were, in fact, only concerned with

3

siphoning fees from AIM/INVESCO Fund investors to induce brokers artificially to increase the sale of shares of AIM/INVESCO Funds. Defendants were motivated to engage in this undisclosed plan of charging excessive fees to induce brokers to steer investors into AIM/INVESCO Funds because, as noted above, the fees collected for managing and advising the AIM/INVESCO Funds were calculated as a percentage of assets under management and, therefore, increased as the number of AIM/INVESCO Funds investors grew.

7.      Defendants' practice of charging excessive fees and commissions to AIM/INVESCO Funds investors to pay and induce brokers to steer investors into the AIM/INVESCO Funds necessarily created insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but in fact were only concerned with their pay-offs from AIM/INVESCO.

8.      In addition, the directors of the Funds breached their fiduciary duties in that they failed to negotiate lower fees for the Funds investors and ignored the fact that there were millions of dollars being paid out by the Funds and their investors and no benefits were coming back in exchange (*i.e.*, that the fees were excessive). These directors, who are supposed to be the watchdogs looking out for the Funds investors, instead approved the excessive fees when it was and should have been obvious that the fees bore no reasonable relationship to the services rendered, thereby breaching their own fiduciary duties.

9.      Defendants omitted disclosure of any of the *quid pro quo* arrangements with brokers and the use of investor assets to finance these programs. Defendants concealed such fees used to induce brokers to push AIM/INVESCO Funds as they realized that the inducements created insurmountable conflicts of interest significant to any reasonable person deciding how to invest his or her money.

10.     Defendants' wrongdoing described herein directly impacted Plaintiffs and the Class. Unlike a traditional corporation, a mutual fund is a collection of the investors' money. The purpose of the corporate structure of a mutual fund is to protect shareholders' investments. Because a mutual fund is a mere shell, the excessive fees and charges at issue here charged by Defendants to the Funds investors immediately reduced the Funds' net asset value ("NAV") per share, thereby decreasing the value of each shareholder's investment in the affected Fund(s) and the amount by which each shareholder is entitled to redeem his or her shares. This has a direct impact on shareholders.

11.     Investment advisers, distributors and brokerage firms have been subject to enforcement actions for entering into the very types of arrangements alleged herein and failing to adequately disclose these arrangements to investors. In actions to date against brokerage houses Morgan Stanley DW, Inc. ("Morgan Stanley"), Edward D. Jones & Co., Citigroup Global Markets, Inc./Salomon Smith Barney, Inc., American Express Financial Advisors, Inc. ("AEFA"); and mutual fund companies Massachusetts Financial Services, Co., Franklin Templeton Distributors, Inc., Putnam Investment Management, LLC, American Funds Distributors, Inc., and OppenheimerFunds, Inc., the SEC and other regulators have condemned these practices stating that they create insurmountable, undisclosed conflicts of interest in violation of the securities laws. The actions of the AIM/INVESCO defendants described herein are no different from those already condemned by the SEC and others.

12.     As described by former Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 *Los Angeles Times* article, the mutual fund industry "is indeed the world's largest skimming operation," tantamount to "'a $7-trillion trough' exploited by fund managers, brokers and other insiders." Jonathan Peterson, *Senate Panel Chides Fund Industry; New York Attny, Gen. Eliot*

*Spitzer testifies at a hearing that suggests fees may be a target of legislative reforms*, LOS ANGELES TIMES, Jan. 28, 2004, at C4.

13.     The truth about AIM/INVESCO first emerged on November 17, 2003, when the SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned brokerage house Morgan Stanley for, among other wrongdoing, accepting Defendants' impermissible payments in exchange for aggressively pushing AIM/INVESCO Funds over other funds. The SEC stated that "this matter arises from Morgan Stanley DW's failure to disclose adequately certain material facts to its customers…[namely that] it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments." The SEC concluded that such conduct violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), among other statutes, that prohibits one from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *See* November 17, 2003 SEC Order Instituting Administrative Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions Against Morgan Stanley DW Inc., File No. 3-11335, *available at* http://www.sec.gov/litigation/ admin/33-8339.htm (the "SEC November 17, 2003 Cease-and-Desist Order").

14.     In the NASD news release announcing the action it had taken against Morgan Stanley regarding, among other wrongdoing, the improper payments Morgan Stanley had received from AIM/INVESCO, the NASD likewise stated the following:

>This extra compensation paid to Morgan Stanley for the preferential treatment included millions of dollars paid by the mutual funds through commissions charged by the firm for trades it executed for the funds. These commissions were sufficiently large to pay for the special treatment, as well as the costs of trade execution.

6

The NASD then concluded that the payments at issue here violated NASD Rule 2830 that

prohibits the type of directed brokerage paid by AIM/INVESCO:

> This conduct violated NASD's "Anti-Reciprocal Rule," Conduct
> Rule 2830(k), which prohibits members from favoring the
> distribution of shares of particular mutual funds on the basis of
> brokerage commissions to be paid by the mutual fund companies...

Press Release, NASD Charges Morgan Stanley with Giving Preferential Treatment to Certain

Mutual Funds in Exchange for Brokerage Commission Payments (Nov. 17, 2003) (on file with

NASD), *available at* http://www.nasd.com/web/idcplg?IdcService=SS_GET_PAGE&ssDoc

Name=NASDW_002819&ssSourceNodeId=554 (the "November 17, 2003 NASD News

Release"); *see also* NASD Rule 2830(k).

     15.     Indeed, Defendants – as operators and overseers of the AIM/INVESCO Funds –

are currently the subject of widespread and intensive regulatory investigations related to

excessive or improper advisory and distribution fees and mutual fund sales practices, including

revenue sharing and directed brokerage arrangements. Among the governmental regulators

investigating INVESCO and/or AIM and certain of their affiliates and/or directors for the

practices detailed throughout this Complaint are: the SEC, the NASD, the Florida Department of

Financial Services, the Attorney General of the State of West Virginia, the West Virginia

Securities Commission, the Bureau of Securities of the State of New Jersey, the United States

Department of Labor and the United States Attorney's Office for the Southern District of New

York. *See* March 1, 2005 Registration Form for the AIM Investment Funds, *available at*

http://www.sec.gov/Archives/edgar/data/826644/000095012905001837/h22856ae485apos.txt.

## JURISDICTION AND VENUE

     16.     The claims asserted herein arise under and pursuant to Sections 34(b), 36(a),

36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and

80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, and the common law.

17.    This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. §1391(b).

18.    Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendants AIM Management Group Inc. and AIM were at all relevant times, and still are, headquartered in this District.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

20.    Plaintiff Joy D. Beasley held during the Class Period and continues to own shares or units of the AIM Basic Value Fund and has been damaged by the conduct alleged herein. A copy of Ms. Beasley's verification is attached hereto as Exhibit B.

21.    Plaintiff Sheila McDaid (aka Cecelia J. McDaid) held during the Class Period and continues to own shares or units of the INVESCO Technology Fund, and has been damaged by the conduct alleged herein. A copy of Ms. McDaid's verification is attached hereto as Exhibit B.

22.    Plaintiff City of Chicago Deferred Compensation Plan ("Chicago") is a municipal deferred compensation plan located in Chicago, Illinois. Chicago was formed pursuant to

8

Section 457 of the United States Internal Revenue Code (26 U.S.C. § 457) for the benefit of the current and retired employees of the City of Chicago and their beneficiaries. Chicago held during the Class Period shares or units of the INVESCO Dynamics Fund and the AIM Constellation Fund, and has been damaged by the conduct alleged herein.

   23. Plaintiff Richard Tim Boyce held during the Class Period and continues to own shares or units of the AIM European Fund (f/k/a INVESCO European Fund), and has been damaged by the conduct alleged herein.

   24. Plaintiff Robert P. Apu held during the Class Period shares or units of the AIM European Growth Fund and AIM Group Value Fund, and has been damaged by the conduct alleged herein.

   25. Plaintiff Suzanne K. Apu held during the Class Period shares or units of the AIM European Growth Fund. Together with Robert P. Apu, Suzanne K. Apu also held during the Class Period and continues to own shares or units of the AIM Weingarten Fund and AIM Premier Equity Fund, and has been damaged by the conduct alleged herein.

   26. Plaintiff Marina Berti held during the Class Period shares or units of the AIM Premier Equity Fund and AIM Mid Cap Core Equity Fund, and has been damaged by the conduct alleged herein.

   27. Plaintiff Khanh Dinh held during the Class Period shares or units of the AIM Constellation Fund, and has been damaged by the conduct alleged herein.

   28. Plaintiff Frank Kendrick held during the Class Period shares or units of the AIM Weingarten Fund and AIM Basic Value Fund, and has been damaged by the conduct alleged herein.

9

29.     Plaintiff Edward A. Krezel held during the Class Period shares or units of the AIM Basic Value Fund, and has been damaged by the conduct alleged herein.

30.     Plaintiff Dan B. Lesiuk held during the Class Period shares or units of the AIM Basic Value Fund, and has been damaged by the conduct alleged herein.

31.     Plaintiff John B. Perkins held during the Class Period shares or units of the AIM Basic Value Fund, and has been damaged by the conduct alleged herein.

32.     Plaintiff J. Doris Willson held during the Class Period shares or units of the AIM Premier Equity Fund and INVESCO Dynamics Fund, and has been damaged by the conduct alleged herein.

33.     Plaintiff Robert W. Wood held during the Class Period shares or units of the AIM Select Equity Fund, and has been damaged by the conduct alleged herein.

34.     Plaintiff Bob J. Fry held during the Class Period shares or units of the INVESCO Worldwide Communications Fund, INVESCO European Fund and INVESCO Telecommunications Fund, and has been damaged by the conduct alleged herein.

35.     Plaintiff Janice R. Fry held during the Class Period shares or units of the INVESCO Telecommunications Fund, INVESCO European Fund, INVESCO Financial Services Fund, INVESCO Health Sciences Fund, INVESCO Worldwide Communications Fund, and INVESCO Technology Fund, and has been damaged by the conduct alleged herein.

36.     Plaintiff James P. Hayes held during the Class Period shares or units of the AIM Aggressive Growth Fund, AIM Global Aggressive Growth Fund, AIM Group Value Fund, AIM Capital Development Fund, AIM Charter Fund and AIM Group Income Fund, and has been damaged by the conduct alleged herein.

37.     Plaintiff Virginia L. Magbual held during the Class Period shares or units of the INVESCO Leisure Fund and has been damaged by the conduct alleged herein.

38.     Plaintiff Henry W. Meyer held during the Class Period and continues to own shares or units of the AIM Balanced Fund, AIM Constellation Fund and AIM Large Cap Growth Fund, and has been damaged by the conduct alleged herein.

39.     Plaintiff George Robert Perry held during the Class Period shares or units of the INVESCO Financial Services Fund, and has been damaged by the conduct alleged herein.

40.     Plaintiff Harvey R. Bendix held during the Class Period shares or units of the INVESCO Leisure Fund, and has been damaged by the conduct alleged herein.

41.     Plaintiff Cvetan Georgiev held during the Class Period shares or units of the AIM VI Capital Appreciation Fund, and has been damaged by the conduct alleged herein.

42.     Plaintiff David M. Lucoff held during the Class Period shares or units of the AIM Basic Value Fund and the AIM Constellation Fund, and continues to own shares or units of the AIM Capital Development Fund, and has been damaged by the conduct alleged herein.

43.     Plaintiff Michael E. Parmalee, Trustee of the Herman S. and Esperanza A. Drayer Residual Trust U/A 4/22/83, held during the Class Period shares or units of the AIM Floating Rate Fund, and has been damaged by the conduct alleged herein.

44.     Plaintiff Kehlbeck Trust Dtd 1-25-93, Billy B. Kehlbeck and Donna J. Kehlbeck TTEES, held during the Class Period shares or units of the AIM Large Cap Growth Fund and the AIM Blue Chip Fund, and has been damaged by the conduct alleged herein.

**Sub-Class Plaintiffs**

45.     Sub-Class Plaintiff Stanley S. Stephenson, Trustee of the Stanley J. Stephenson Trust, purchased prior to and held during the Class Period shares or units of the AIM Limited Maturity Treasury Fund, and has been damaged by the conduct alleged herein.

46.     Sub-Class Plaintiff Robert P. Apa purchased prior to and held during the Class Period shares or units of the AIM Weingarten Fund, and has been damaged by the conduct alleged herein.

**Non-Party**

47.     Nonparty AMVESCAP PLC is one of the largest independent global investment managers in the world, with more than $375 billion in assets under management as of March 31, 2005.  AMVESCAP PLC is the ultimate parent of defendants AIM, INVESCO and AIM Management Group Inc.

**The AIM/INVESCO Defendants**

48.     Defendant AIM Management Group Inc. ("AMG") is an affiliate of AMVESCAP PLC and the parent company of AIM.  AMG is located at 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

### The Investment Adviser Defendants

49.     Defendant INVESCO is an indirect wholly-owned subsidiary of AMVESCAP PLC located at 4350 S. Monaco Street, Denver, Colorado 80237, and was at all relevant times the investment adviser to the INVESCO Funds.  INVESCO collected during the Class Period various forms of compensation for "managing" and "advising" the INVESCO Funds, including millions of dollars in advisory, distribution, 12b-1 and other fees as a percentage of assets under management.

(a)     On November 25, 2003, AIM succeeded INVESCO as the investment adviser to the INVESCO Funds other than INVESCO Variable Investment Funds, Inc. ("IVIF"). AIM replaced INVESCO as the adviser for IVIF in April 2004.

(b)     As a result of the transition of investment adviser for the INVESCO Funds from INVESCO to AIM, as of October 15, 2004 each of the INVESCO Funds that is the subject

12

of this action was re-branded as an AIM Fund, as set forth in Appendix A. According to a *Washington Post* article, the INVESCO name was dropped principally because of the immense negative publicity generated by the scandals in which INVESCO has been involved and the related regulatory investigations and settlements. *See* Brooke A. Masters, *"Problems? Try A New Name; Some Funds Look To Change The Way Investors See Them,"* WASHINGTON POST, Sept. 17, 2004, at E01.

50.     Defendant AIM serves as investment adviser to, among other entities, the AIM/INVESCO Funds. AIM collected during the Class Period, and continues to collect, various forms of compensation for "managing" and "advising" the AIM Funds, including millions of dollars in advisory, distribution, 12b-1 and other fees as a percentage of assets under management. For example, during the fiscal year 2003, AIM received compensation of approximately .67% of average daily net assets under management for advisory fees alone. AIM, together with its subsidiaries, managed or advised over 155 funds or portfolios, including over 70 "retail" funds with $131 billion in assets under management as of March 31, 2005. AIM is located at 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

51.     INVESCO and AIM are referred to collectively herein as the "Investment Adviser Defendants."

52.     The Investment Adviser Defendants are registered as investment advisers under the Investment Advisers Act. Fees payable to the Investment Adviser Defendants are calculated as a percentage of fund assets under management.

53.     Pursuant to their advisory agreements with the AIM/INVESCO Portfolios, the Investment Adviser Defendants provide to the Portfolios research, advice, and supervision with respect to investment matters. Additionally, the Advisers: (i) determine through which broker-

dealers the Portfolios will execute their securities transactions; and (ii) negotiate with broker-dealers the terms of such agreements, including commissions, the amounts of Soft Dollars (as defined below), revenue sharing and directed brokerage payments (discussed more fully hereinafter) to be paid by the Funds' investors to the broker-dealers.

**The Distributor Defendants**

54.     Defendant AIM Distributors, Inc. ("ADI"), a private subsidiary of AMG and a broker-dealer registered with the SEC, serves as the principal underwriter of each of the AIM/INVESCO Funds and was paid fees out of the assets of the AIM Funds investors during the Class Period.  ADI is located at 11 Greenway Plaza, Suite 800, Houston, Texas 77046.

55.     Defendant INVESCO Distributors, Inc. ("IDI") is a wholly-owned subsidiary of INVESCO.  IDI is a broker-dealer registered with the SEC and served as the principal underwriter of each the INVESCO Funds and was paid fees out of the assets of the INVESCO Funds investors during the Class Period.  IDI is located at 4350 South Monaco Street, Denver, Colorado 80237.

56.     ADI and IDI are collectively referred to herein as the "Distributor Defendants."

**Nominal Defendants:  The AIM/INVESCO Funds**

57.     The Nominal Defendants are the AIM/INVESCO Funds, as identified in the list annexed hereto as Appendix A, and all trusts and corporations that comprised the AIM/INVESCO Funds that were advised and managed by INVESCO and/or AIM during the Class Period.  Each trust or corporation has a board of directors who are responsible for the trust's or corporation's administration.  Each of the AIM/INVESCO Funds is an open-end management investment company, or mutual fund, in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities.

14

58.     The AIM/INVESCO Funds offer multiple classes of shares, with each class representing a *pro rata* interest in each AIM/INVESCO Fund. AIM/INVESCO Fund shares are issued to AIM/INVESCO Fund shareholders pursuant to Prospectuses that must comply with the federal securities laws, including the Investment Company Act. All of the Prospectuses are substantially the same on the matters relevant to this litigation.

59.     All of the AIM/INVESCO Funds are alter egos of one another. The AIM/INVESCO Funds are essentially pools of investor assets that are managed and administered by a common body of directors and employees of AIM and/or INVESCO who administer the AIM/INVESCO Funds generally. The AIM/INVESCO Funds have no independent will and are totally dominated by the Investment Adviser Defendants and the common body of directors established by the Investment Adviser Defendants. Thus, in substance, the AIM/INVESCO Funds function as components of one unitary organization.

60.     All AIM/INVESCO Funds shared throughout the Class Period the same affiliated companies as their investment advisers and shared either IDI or ADI as their principal underwriter and distributor. Currently, all of the AIM/INVESCO Funds share the same investment adviser, AIM, and the same distributor, ADI. Additionally, the Defendants pool together fees and expenses collected from the AIM/INVESCO Fund shareholders, and as a result the AIM/INVESCO Funds share expenses with one another.

61.     Furthermore, any commissions generated through directed brokerage relationships (discussed in more detail below) relating to the sale or marketing of any particular AIM/INVESCO Fund are lumped together with all the other commissions on the Funds managed by Defendants and are not Fund-specific. For example, as explained in an internal INVESCO

Funds memorandum from Mark H. Williamson (a Defendant in this case) and Ray Cunningham

to the INVESCO Mutual Funds Brokerage Committee, dated January 24, 2001:

> If the Boards approve [the brokerage] relationship [with American
> Express Financial Advisers ("AEXP")], **commissions generated
> in the arrangement will not be Fund-specific. In other words,
> commissions generated by transactions for the Total Return
> Fund may be used to reward sales of shares of the Equity
> Income Fund and vice-versa.** (Emphasis added).

62.     The AIM/INVESCO Funds are named as nominal defendants herein to the extent

that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal

Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate

remedies.

### The Director Defendants

63.     Each of the AIM/INVESCO Funds had during the Class Period a Board charged

with representing the interests of the shareholders in one or a series of the AIM/INVESCO

Funds.  The members of those Boards are, as defined herein, the Director Defendants.  The AIM

Director Defendants and the INVESCO Director Defendants, as defined immediately below, are

referred to collectively herein as the "Director Defendants."

### The AIM Director Defendants

69.     The following Defendants were directors of the AIM Funds and/or the trusts or

entities that consisted of the AIM Funds during the Class Period:

(a)     Defendant Robert H. Graham ("Graham") was a director and Chairman of

AMG during the Class Period.  Graham is an interested person of the AIM/INVESCO Funds

within the meaning of Investment Company Act Section 2(a)(19)(A) (15 U.S.C. § 80a-

2(a)(19)(A)) because he is also a director of AMVESCAP PLC, the parent of AIM and AMG.

16

(b)     Defendant Mark H. Williamson ("Williamson") was a director, President and Chief Executive Officer ("CEO") of AMG during the Class Period. Williamson was also CEO of INVESCO and IDI during the Class Period. Williamson is an interested person of the AIM/INVESCO Funds within the meaning of Investment Company Act Section 2(a)(19)(A) (15 U.S.C. § 80a-2(a)(19)(A)) because he is also an officer and director of AIM and AMG.

(c)     Defendant Frank S. Bayley ("Bayley") was a director during the Class Period. Bayley received compensation totaling approximately $614,000 during the Class Period.

(d)     Defendant Bruce L. Crockett ("Crockett") was a director during the Class Period. Crockett received compensation totaling approximately $874,000 during the Class Period.

(e)     Defendant Albert R. Dowden ("Dowden") was a director during the Class Period. Dowden received compensation totaling approximately $640,935 during the Class Period.

(f)     Defendant Edward K. Dunn, Jr. ("Dunn") was a director during the Class Period. Dunn received compensation totaling approximately $844,000 during the Class Period.

(g)     Defendant Jack M. Fields ("Fields") was a director during the Class Period. Fields received compensation totaling approximately $834,000 during the Class Period.

(h)     Defendant Carl Frischling ("Frischling") was a director during the Class Period. Frischling received compensation totaling approximately $836,000 during the Class Period.

(i)     Defendant Prema Mathai-Davis ("Mathai-Davis") was a director during the Class Period. Mathai-Davis received compensation totaling approximately $839,250 during the Class Period.

17

(j)      Defendant Lewis F. Pennock ("Pennock") was a director during the Class Period.  Pennock received compensation totaling approximately $841,500 during the Class Period.

(k)      Defendant Ruth H. Quigley ("Quigley") was a director during the Class Period.  Quigley received compensation totaling approximately $615,250 during the Class Period.

(l)      Defendant Louis S. Sklar ("Sklar") was a director during the Class Period.  Sklar received compensation totaling approximately $835,000 during the Class Period.

(m)      Defendants Graham, Williamson, Bayley, Crockett, Dowden, Dunn, Fields, Frischling, Mathai-Davis, Pennock, Quigley, and Sklar are referred to collectively herein as the "AIM Director Defendants."  As of May 2004, each of the AIM Director Defendants oversaw at least 112 separate AIM/INVESCO Funds or "portfolios."  The AIM Director Defendants' business address is 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

### The INVESCO Director Defendants

64.      The following defendants were directors of the INVESCO Funds and/or the trusts or entities that consisted of the INVESCO Funds during the Class Period:

(a)      Defendant Fred A. Deering ("Deering") was Vice Chairman of the Board during the Class Period.  Deering also served as a member of the Executive, Audit, Valuation, Legal, Insurance, and Nominating Committees during the Class Period.  Deering received compensation totaling approximately $475,800 during the Class Period.

(b)      Defendant Victor L. Andrews, Ph.D. ("Andrews") was a director during the Class Period.  Andrews also served as a member of the Investments and Management Liaison, Derivatives, Compensation, and Retirement Plan Committees during the Class Period.  Andrews received compensation totaling approximately $401,100 during the Class Period.

(c)     Defendant Bob R. Baker ("Baker") was a director during the Class Period. Baker also served as a member of the Executive, Valuation, Investments and Management Liaison, Brokerage, Nominating, Compensation, and Retirement Plan Committees during the Class Period.  Baker received compensation totaling approximately $760,354 during the Class Period.

(d)     Defendant Lawrence H. Budner ("Budner") was a director during the Class Period.  Budner also served as a member of the Audit, Brokerage, Compensation, and Retirement Plan Committees during the Class Period.  Budner received compensation totaling approximately $391,900 during the Class Period.

(e)     Defendant James T. Bunch ("Bunch") was a director during the Class Period.  Bunch also served as a member of the Investments and Management Liaison, Brokerage, and Nominating Committees during the Class Period.  Bunch received compensation totaling approximately $627,654 during the Class Period..

(f)     Defendant Gerald J. Lewis ("Lewis") was a director during the Class Period.  Lewis also served as a member of the Audit, Derivatives, and Legal Committees during the Class Period.  Lewis received compensation totaling approximately $626,254 during the Class Period.

(g)     Defendant John W. McIntyre ("McIntyre") was a director during the Class Period.  McIntyre also served as a member of the Executive, Audit, Valuation, Brokerage, and Legal Committees during the Class Period.  McIntyre received compensation totaling approximately $465,750 during the Class Period.

(h)     Defendant Larry Soll, Ph.D. ("Soll") was a director during the Class Period.  Soll also served as a member of the Investments and Management Liaison, Derivatives,

Nominating, Compensation, and Retirement Plan Committees during the Class Period. Soll received compensation totaling approximately $775,329 during the Class Period.

(i)       Defendants Deering, Andrews, Baker, Budner, Bunch, Lewis, McIntyre and Soll are referred to collectively herein as the "INVESCO Director Defendants." As of May 2004, each of the INVESCO Director Defendants oversaw at least 112 separate AIM/INVESCO Funds or "portfolios." The INVESCO Director Defendants' business address is 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

**The John Doe Defendants**

65.     The true names and capacities of Defendants sued herein as John Does 1 through 100 are other active participants with the above-named Defendants whose identities have yet to be ascertained.

SUBSTANTIVE ALLEGATIONS

**ALL OF THE DEFENDANT ENTITIES INVOLVED WITH RUNNING, ADVISING, MANAGING AND PROTECTING THE FUNDS INVESTORS VIOLATED THEIR DUTIES IN CHARGING AND OBTAINING EXCESSIVE FEES**

66.     The fees charged to mutual fund investors are required to reflect the equivalent of fees that would have been the result of arm's-length negotiation. Directors are supposed to negotiate the fees charged to the fund investors on behalf of the investors who, individually, are unable to negotiate such fees. At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to investors in that the fees must be reasonably related to the services provided and conflicts of interests should be disclosed.

67.     Congress and the Supreme Court have recognized the potential conflicts of interest that exist in the mutual fund industry and placed safeguards to protect investors. Since it is difficult for investment advisers to be completely impartial towards clients given their profitability goals, investment advisers are under a duty to disclose to clients all material

20

information "which might incline an investment adviser – consciously or unconsciously – to render advice which [is] not disinterested." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). The Investment Adviser Defendants failed adequately to disclose to shareholders that fees were actually being used for the payment of kickbacks to brokers solely to benefit these and the other Defendants and that investors did not receive any benefit therefrom. In fact, the inflated fees that the Investment Adviser Defendants charged the Funds and their investors were not reasonably related to services rendered and were therefore excessive.

68.     Distributors, as affiliates of the investment adviser, are also fiduciaries to investors with respect to the fees investors pay. Furthermore, the NASD has implemented additional regulations to prevent registered distributor broker-dealers (such as the Distributor Defendants here) from offering gifts or making directed brokerage payments to brokers on the condition of sales of a mutual fund. In violation of the foregoing, the Distributor Defendants were the conduit for arrangement of the revenue sharing payments to brokers on behalf of AIM/INVESCO. For example, according to recent disclosures from Morgan Stanley, gross payments, asset payments and recordkeeping payments were made to brokers by the Distributor Defendants on behalf of the AIM/INVESCO Fund family in exchange for "Shelf Space." As is common in revenue arrangements, and can be presumed on the basis of the Distributor Defendants entering arrangements with brokerage firms on behalf of a fund family, distributors tell the investment adviser where to direct brokerage to fulfill revenue sharing obligations.

69.     As to the directors, Congress fortified directors' duties by adopting Section 15(c) of the Investment Company Act, requiring directors to be adequately informed and giving them the authority to demand documents from investment advisers to make their decisions. Because AIM/INVESCO's directors were beholden to the Investment Adviser Defendants and in breach

of their fiduciary duties, the Director Defendants failed to adequately inform themselves or

negotiate lower advisory and distribution fees with the Investment Adviser Defendants.

Furthermore, the Director Defendants failed to hold the Investment Adviser Defendants

accountable for revenue sharing agreements entered into by AIM/INVESCO with various

brokerage firms, and other shelf space payments for which the Investment Adviser Defendants

and Distributor Defendants charged the Funds and their investors excessive fees and

commissions.

70.     Various fees and use of Fund assets are determined between the above-mentioned

parties.  Specifically, the directors negotiate with investment advisers and distributors,

investment advisor fees, 12b-1 fees, service fees, Soft Dollars and directed brokerage.

Investment adviser fees are usually a percentage of assets under management.  As the fund assets

increase, such fees parallel this growth.  The growth of fund assets may occur for various

reasons, including increased investments, high returns or market appreciation.

71.     12b-1 fees get their name from the SEC rule that authorizes their payment.  Rule

12b-1 permits a fund to pay distribution fees out of fund assets only if the fund has adopted a

plan (12b-1 plan) authorizing their payment.  "Distribution fees" include fees paid for marketing

and selling fund shares, such as compensating brokers and others who sell fund shares, and

paying for advertising, the printing and mailing of prospectuses to new investors, and the

printing and mailing of sales literature.  The NASD has placed a 1% cap on the amount of 12b-1

fees that may be charged to the fund, and the AIM/INVESCO Defendants often charged the

maximum amount (1%) permissible.

72.     Service fees are fees paid to persons to respond to investor inquiries and provide

investors with information about their investments.  Unlike distribution fees, a fund may pay

shareholder service fees without adopting a 12b-1 plan. The NASD imposes an annual .25% cap on shareholder service fees (regardless of whether these fees are authorized as part of a 12b-1 plan).

73.     "Soft Dollar" practices are arrangements under which products or services other than execution of securities transactions are obtained by an adviser from or through a broker-dealer in exchange for the direction by the adviser of client brokerage transactions to the broker-dealer. In other words, funds are allowed to include in "commissions" payments for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sales charges are known as "Soft Dollars."

74.     Directed brokerage is the practice of investment advisers directing the underlying portfolio securities transactions to broker-dealers that sell shares of the fund in return for favored treatment. The practice raises a problem for investors because, *inter alia*, it creates a conflict of interest for the investment adviser for the reasons discussed herein, it encourages churning of clients' accounts and, according to the SEC, it has led funds to "pay up," or trade securities at commission rates higher than the fund would pay if it were not indirectly paying for distribution through directing brokerage.

75.     All of the Defendants involved with running, advising and protecting the Funds and their investors violated their duties. As described above, the Investment Adviser Defendants (along with the Distributor Defendants) secretly siphoned monies from the Funds and their investors in various forms, as described below, in order to pay for shelf space at brokerage

houses.  The AIM/INVESCO Funds grew as a result and so did the Investment Adviser

Defendants' asset-based fees.  But the services being performed by the Investment Adviser

Defendants did not change and economies of scale were not passed on to investors, resulting in

the receipt of excessive fees from investors.  The Director Defendants breached their fiduciary

duty to be adequately informed and negotiate the advisory and distribution fees on behalf of the

Fund shareholders so as to ensure that such fees were not excessive.  They were beholden to the

Investment Adviser Defendants, and siphoned monies from the Funds and their investors in the

form of excessive fees, as described herein.  In light of these conflicted positions, no entity is

performing the "watchdog" role or otherwise looking out for the Funds or their investors.

**Investment Adviser Revenues Were Significantly**
**Increasing Before and During The Class Period**

76.    AIM/INVESCO's Fund sales and, thus, asset-based investment advisory fees,

increased significantly over time, including during the Class Period.  For instance,

AIM/INVESCO Fund assets under management grew 29% from $357.4 billion in 1999 to about

$461 billion through the first half of 2005.  This increase in assets means that the dollar amounts

of the asset-based advisory fees have also significantly increased.

77.    Additionally, as an example, in 1999, the shareholders of the AIM Large Cap

Growth Fund paid $42,255 in investment advisory fees and by 2003, the fund was paying

$2,850,279 in investment advisory fees.  During this time, according to the master investment

advisory agreements, the advisory fees that were paid (which were a percentage of the Fund's

average daily net assets) remained the same when they should have been decreasing to account

for the economies of scale.  In addition, the administration fees paid by the AIM Large Cap

Growth Fund and their investors increased substantially during the Class Period, going from

$29,197 in 1999 to $218,708 in 2004. *See* October 31, 1999 and October 31, 2004 Large Cap

Growth Fund Annual Reports. Despite this significant increase in fees, the AIM Large Cap Growth Fund Prospectuses did not cite any differences in the services provided during this time period. Additionally, net assets for the fund increased from $4.3 million to $680 million. In the 1999 annual report, the Manager's Overview section even highlighted the fact that "[n]et assets under management soared to $14 million" from $4.3 million in just six months. In light of the increased assets under management and the economies of scale created, the fees charged by Defendants to their Funds and their investors were grossly disproportional to the services that were being provided. Also during this same time, AMVESCAP's revenue increased from $1.33 billion to $2.21 billion. As explained in the AMVESCAP PLC (the parent company of AIM and INVESCO) 2004 Annual Report, revenues arise substantially from management, service and distribution fees generated from assets under management.

78.     Due in large part to Defendants' shelf space payments, the assets managed by the Investment Adviser Defendants have grown dramatically, and so have their revenues, net income and profit margins. During the Class Period, the immense growth of assets under management has generated substantial economies of scale to the great benefit of Defendants, which have not been passed on to the Funds or their investors through lower fees.

79.     As a result of these practices, the mutual fund industry was enormously profitable for AIM and INVESCO. However, AIM and INVESCO's profits at the expense of AIM/INVESCO Fund shareholders remained unchecked by the Director Defendants throughout the Class Period. In this regard, a *Forbes* article stated:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall ...

*     *     *

25

> **The [mutual fund] business grew 71-fold (20-fold in real terms)**
> **in the two decades through 1999, yet costs as a percentage of**
> **assets somehow managed to go up 29%. . . .** Fund vendors have
> a way of stacking their boards with rubber stamps. As famed
> investor Warren Buffett opines in Berkshire Hathaway's 2002
> annual report: "Tens of thousands of independent directors, over
> more than six decades, have failed miserably." A genuinely
> independent board would occasionally fire an incompetent or
> overcharging fund adviser. That happens just about never.

*See* Neil Weinberg and Emily Lambert, *The Great Fund Failure*, FORBES, Sept. 15, 2003, at 176

(emphasis added).

80.     The excessive fees only served the purpose of increasing Defendants' profits.

The profitability of a fund to an adviser-manager is a function of revenues minus the costs of

providing services. Defendants' incremental costs of providing advisory services to the Funds

were nominal, while the additional fees received by Defendants were hugely disproportionate

given that the nature, quality, and level of the services remained the same.

**Defendants Took Advantage of Various Types of**
**Fees by Making Excessive Charges to the Funds**

81.     According to SEC filings, Defendants' main source of revenue is derived from

investment adviser, administration, distribution and service fees. In the absence of effective

"watchdogs" (*i.e.*, the Director Defendants), the Investment Adviser Defendants and Distributor

Defendants were able to take advantage of various forms of fees and Fund assets under their

control. Specifically, Defendants charged excessive investment adviser fees, administration fees,

12b-1 fees, service fees, and brokerage commissions.

82.     During the Class Period, the distribution fees significantly increased. For

example, in the AIM Large Cap Growth Fund, distribution fees charged to Class A shares rose

from $13,159 in 1999 to $606,542 in 2004; distribution fees charged to Class B shares rose from

$16,134 in 1999 to $1,205,821 in 2004; and distribution fees charged to Class C shares rose from

$2,610 in 1999 to $499,243 in 2004. This disproportional increase without any correlating increase in services, especially in light of the Funds' fixed costs, is illustrative of the excessiveness of the fees charged.

83.     Furthermore, fund statistics also demonstrate that fees were actually increasing when they should have been decreasing due to economies of scale from increased assets. As was noted by Russel Kinnel, director of mutual-fund research at Morningstar, "[t]he mutual-fund business hasn't done a good job of delivering economies of scale." Adrienne Carter, *Mutual Funds: Why Fees Still Defy Gravity*, BUSINESS WEEK, May 2, 2005, at 70. This is clearly illustrated when looking at AIM/INVESCO's ratio of expenses compared to the increase in net assets. For example, despite the fact that net assets for the AIM Core Stock Fund increased from $4.674 million in 2003 to $8.159 million in 2004, the net asset value per share of the fund decreased from $11.56 to $10.86. Yet, during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets increasing from 1.23% to 1.25%. Additionally, the management fees remained constant at 0.51% (meaning the dollars paid increased substantially), but no additional services were provided.

84.     Similarly, despite the fact that net assets for the AIM High Income Municipal Fund increased from $38.645 million in 2000 to $94.657 million in 2004, the net asset value per share of the fund decreased from $10.04 to $8.64. Yet, during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets increasing from 0.50% to 0.55%. Additionally, the management fees remained constant at 0.60% (meaning the dollars paid increased substantially), but no additional services were provided.

85.     Similarly, despite the fact that net assets for the AIM European Growth Fund increased from $157.651 million in 2001 to $301.659 million in 2003, the net asset value per

share of the fund decreased from $23.59 to $15.60. Yet, during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets increasing from 1.83% to 2.01%. Additionally, the management fees remained constant at 0.95% (meaning the dollars paid increased substantially), but no additional services were provided.

86.     AIM/INVESCO's high expenses and failure to pass on any economies of scale is further reflected when comparing AIM/INVESCO's Fund expenses to the expenses charged by other, smaller funds with less economies of scale available. For instance, the AIM Dent Demographic Trends Fund, with $478 million in assets as of July 31, 2004, had annual expenses of $2.00 per $100 invested. Much smaller funds, with less than $70 million in assets, had between $0.80 -$1.15 in annual expenses per $100 invested. James M. Clash, *The Frugal Investor*, FORBES MAGAZINE, Sept. 20, 2004, at 230, *available at* http://www.forbes.com/forbes/2004/0920/230_print.html.

87.     Subsequent to the Class Period and as a result of being under intense scrutiny from regulators, new competitors and consumers have become aware of the "ravages of high fees," and other investment advisers have started to reduce their fees throughout the mutual fund industry. According to Lipper (which provides research and analysis on mutual funds), between July 31, 2003 and July 21, 2004, 528 mutual funds decreased fees at the portfolio level. Daniel Gross, *Mutual Funds, Crazy Eddie-Style, Why They're Slashing Fees*, SLATE, Sept. 28, 2004, http://slate.msn.com/id/2107369/. Similarly, AIM/INVESCO has also waived advisory fees payable to AIM by certain AIM Funds, effective January 1, 2005.

88.     The economies of scale enjoyed by Defendants with respect to the fees they collect have not been shared with Funds investors as required by Section 36(b) of the Investment Company Act and Rule 12b-1. Instead, as shown above, as the size of the Funds grew,

28

Defendants' fees increased without any corresponding increase in services to the Funds, and

Defendants' costs decreased due to economies of scale. As a result, the fees paid to Defendants

for services provided to the Funds were grossly disproportionate to those services, were

excessive, and violated Section 36(b).

**The Fees Are Also Excessive When Compared To Fees
Charged Where Both Parties Negotiated At Arm's-Length**

89.     The excessiveness of the fees charged by Defendants is illustrated by the lower

fees paid by unaffiliated investment management companies to Investment Adviser Defendants

when it acted as sub-adviser to unaffiliated funds. Fund companies sometimes hire outside

money managers, known as sub-advisers, to do the day-to-day stock or bond picking. The fees

in these relationships tend to be lower. As noted by New York Attorney General Eliot Spitzer

when discussing advisory fees before the United States Senate:

> [U]nlike most mutual fund fees where directors rubber stamp their
> affiliated management company's request, the fees charged by
> subadvisors are the product of an arms length negotiation between
> disinterested parties.

*See* Eliot Spitzer, Before the United States Senate Governmental Affairs Committee

Subcommittee on Financial Management of the Budget, and International Security (Jan. 27,

2004).

90.     As part of Spitzer's settlement with Defendants regarding their unlawful market

timing activities, Defendants agreed to fee advisory reductions and to publicly disclose a

summary of a senior officer's evaluation of fees. These disclosures discuss how AIM's fees

compare for providing advisory services to AIM Funds versus sub-advisory services to

unaffiliated funds. According to these disclosures, Defendants routinely charged more

investment advisory fees to AIM Funds compared to fees charged for sub-advisory fees to

unaffiliated funds. For example, AIM's Aggressive Growth Fund fees are higher than sub-

advisory fee rates for four unaffiliated mutual funds for which an AIM affiliate serves as sub-adviser; AIM Basic Value Fund's fees were higher than sub-advisory fee rates for which an affiliate of AIM serves as sub-advisor; and AIM Blue Chip Fund's advisory fee rate was higher than what it charged for three unaffiliated mutual funds for which an AIM affiliate serves as a sub-advisor.

**DEFENDANTS IMPROPERLY USED FUND ASSETS TO
ENTICE BROKERS TO PUSH AIM/INVESCO
MUTUAL FUNDS ON UNWITTING INVESTORS**

**Defendants Used Improper Means to Acquire "Shelf Space" at Brokerages**

91.     Unbeknownst to Plaintiffs and other members of the Class, AIM/INVESCO used the assets of its mutual fund investors to participate in "shelf-space" programs at various brokerages, including, but not limited to, Morgan Stanley, Salomon Smith Barney, AEFA, H.D. Vest Investment Services and Wachovia Securities. AIM/INVESCO improperly paid these and other brokerages to aggressively push AIM/INVESCO mutual funds on unwitting investors. These arrangements were significant to AIM/INVESCO since revenue sharing arrangements have been known to increase ten-fold the amount of money received by mutual funds. However, the arrangements between AIM/INVESCO and brokerages were illegal because Defendants: (1) used Fund assets to pay for these arrangements; (2) shifted their own out-of-pocket expenses to the Funds; and (3) failed to disclose the magnitude and nature of these arrangements to investors. AIM/INVESCO's practices have led to investigations by the SEC, NASD and various state regulators. To date, these investigations have resulted in fines and censure of Morgan Stanley and AEFA for their acceptance of the improper relationships with AIM/INVESCO.

92.     As alleged herein, Defendants employed several different means to increase their profits by, among other wrongful practices: (1) increasing the amount of fees they were able to retain by shifting fees, expenses and commissions to AIM/INVESCO Fund shareholders; and (2)

enticing third-party brokers to increase sales of AIM/INVESCO Funds, using money paid by current shareholders, thereby increasing the amount of assets under management and profits the Investment Adviser Defendants and their affiliates could reap with no corresponding benefits to the AIM/INVESCO Fund shareholders.

**Participation in Improper Shelf Space Programs with Morgan Stanley**

93.     As mentioned above, AIM/INVESCO participated in "shelf space" programs at brokerages such as Morgan Stanley, Salomon Smith Barney, AEFA, H.D. Vest Investment Services and Wachovia Securities.

94.     Pursuant to the "shelf space" program agreements, brokers steered unwitting clients into AIM/INVESCO Funds because they were paid more for AIM/INVESCO Funds than other mutual funds.

95.     The "shelf space" program AIM/INVESCO participated in at Morgan Stanley was called the "Partners Program." The Partners Program was nothing more than a series of veiled payments by AIM/INVESCO to Morgan Stanley to steer unwitting investors into AIM/INVESCO Funds.  In a nutshell, under the "Partner's Program," Morgan Stanley brokers improperly pushed AIM/INVESCO Funds on unwitting clients because they received more cash to do so.

96.     According to former Morgan Stanley brokers and internal Morgan Stanley documents, pursuant to the Partners Program, Morgan Stanley adopted a broker "Incentive Compensation" payout grid that provided up to 3% greater compensation for "asset-based products" versus "transaction-based products." AIM/INVESCO Funds were classified as "asset-based products," while non-Partner Program funds were classified as "transaction-based products" and resulted in a smaller payout to the brokers.

31

97.     Because of the improper inducements paid by AIM/INVESCO, Morgan Stanley's management made it clear through firm-wide memos that it wanted its brokers to take advantage of the payout grid by directing investors into AIM/INVESCO Funds.  As stated by Bruce Alonso, the managing director of Morgan Stanley's Investor Advisory Services Division, in a firm-wide message entitled "An Important Message from Bruce Alonso Regarding the 2003 Compensation Plan" circulated throughout Morgan Stanley in December of 2002:  "the recently announced 2003 Compensation Plan provides you with the opportunity to increase your overall compensation by focusing on asset-based products," *i.e.*, AIM/INVESCO Funds.

98.     Under the compensation grid discussed above, for instance, a broker whose annual production was over $1 million received 42% of the commissions on "asset-based products" and 40% of the commissions on "transaction-based products."  Accordingly, brokers generally received a higher payout from the sale of the AIM/INVESCO Funds than "non-Partner" mutual funds.

99.     Additionally, in order to further push AIM/INVESCO Funds and reap the benefits of the extra inducements from AIM/INVESCO, Morgan Stanley management gave AIM/INVESCO Funds priority placement in the review of fund materials to be distributed to Morgan Stanley brokers; gave AIM/INVESCO access to Morgan Stanley's branch system at the branch managers' discretion; gave AIM/INVESCO direct access to Morgan Stanley brokers; included AIM/INVESCO in Morgan Stanley broker events; and invited AIM/INVESCO to participate in programs broadcasted to brokers over Morgan Stanley's internal systems.

**The November 17, 2003 Announcement**

100.     On November 17, 2003, Defendants' practices began to come to light when the SEC issued a press release (the "November 17 SEC Release") in which it announced a $50 million settlement of an enforcement action against Morgan Stanley Dean Witter relating to

improper mutual fund sales practices. The AIM Funds were subsequently identified as one of

the mutual fund families that Morgan Stanley brokers were paid to promote. In this regard, the

release announced:

> [T]he institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) for failing to provide customers important information relating to their purchases of mutual fund shares. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.
>
> Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in **which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds. To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.**

*See* Press Release, U.S. Securities and Exchange Commission, SEC Charges Morgan Stanley

With Inadequate Disclosure in Mutual Fund Sales (Nov. 17, 2003) (on file with author),

*available at* http://www.sec.gov/news/press/2003-159.htm (emphasis added).

101.    The November 17 SEC Release further stated:

> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: "**Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives − in the form of "shelf space" payments − to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction.**"

Morgan Stanley has agreed to settle this matter, without admitting or denying the findings in the Commission's Order. As part of the settlement, Morgan Stanley will pay $25 million in disgorgement and prejudgment interest. In addition, Morgan Stanley will pay civil penalties totaling $25 million.

In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; [and] (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes; [. . . .]

Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

\*　　\*　　\*

The NASD also announced today a settled action against Morgan Stanley for violations of NASD Rule 2830(k) arising from the Partners Program and its predecessor.

*Id*. (Emphasis added.)

102.    In fact, the November 17, 2003 NASD News Release explained that:

Morgan Stanley operated two programs - the Asset Retention Program and the Partners Program - in which it gave favorable treatment to products offered by as many as 16 mutual fund companies out of a total of over 115 fund complexes that could be sold by the firm's sales force. In return for these brokerage commissions and other payments, mutual fund companies received preferential treatment by Morgan Stanley...

**This conduct violated NASD's "Anti-Reciprocal Rule," Conduct Rule 2830(k), which prohibits members from favoring**

**the distribution of shares of particular mutual funds on the basis of brokerage commissions to be paid by the mutual fund companies, as well as allowing sales personnel to share in directed brokerage commissions. One important purpose of the rule is to help eliminate conflicts of interest in the sale of mutual funds.**

103.    On November 18, 2003, *The Washington Post* published an article which states in relevant part:

> Investors who bought mutual funds from Morgan Stanley, the nation's second-largest securities firm, didn't know that the company was taking secret payments from some fund companies to promote their products, according to allegations that resulted in a $50 million settlement agreement yesterday with the Securities and Exchange Commission.
>
> In many cases, those same investors were actually footing the bill, indirectly, for the slanted recommendations, the SEC said. Some of the 16 fund companies whose products were pushed by Morgan brokers paid for the marketing help by letting Morgan handle some of their stock and bond trading. The millions of dollars in commissions earned by Morgan on that trading came out of mutual fund share owners' profits, according to the SEC.
>
> \*         \*         \*
>
> **Morgan said yesterday that companies in its "Partners Program" included AIM Management Group Inc. . . .**

*See* Brooke A. Masters and Kathleen Day, *Morgan Stanley Settles with SEC, NASD; Firm Accused of Failing to Disclose Funds' Payments*, THE WASHINGTON POST, Nov. 18, 2003, at E01 (emphasis added.)

104.    On November 24, 2003, the *Chicago Sun-Times* published an article stating that "Morgan Stanley's bill of rights reveals the company receives special payments from 16 funds groups ... Such payments provide these firms with 'greater access' to Morgan Stanley's brokers, with all the fishiness that implies." Russ Wiles, *Investor 'Bill of Rights' Doesn't Go Far Enough*, CHICAGO SUN-TIMES, Nov. 24, 2003, at 63.

105.    According to AIM/INVESCO internal documents, in 2001, Defendants agreed to pay Morgan Stanley a certain percentage in basis points ("bps") (one bps is 0.01%) with Soft Dollars for marketing, and in hard dollars for asset retention.  AIM ranked in the top 10 at Morgan Stanley with sales totaling $407 million.  Furthermore, according to an AIM/INVESCO internal memorandum, as part of AIM's and Morgan Stanley's 2003 marketing support agreement, AIM agreed to pay bps in Soft Dollars on Class A, B and C shares, while meetings were paid in cash.  AIM also agreed to pay cash for a Directors Club meeting held at the Bellagio in Las Vegas, as well as for a Presidents Club meeting also at the Bellagio.  AIM also agreed to pay bps on assets retained for one year or more; cash for networking fees on accounts that are not in an omnibus account; and cash when accounts go into an omnibus account.

**Defendants Negotiated And Profited From  Improper "Shelf Space" Arrangements**

106.    The conflicts of interest and harm to AIM/INVESCO Fund shareholders evidenced by AIM and INVESCO's relationship to Morgan Stanley are paradigmatic of other conflicts of interest and harmful arrangements entered into by Defendants.  Throughout the Class Period, AIM/INVESCO entered into various other *quid pro quo* arrangements with various broker-dealers.  In addition to those already mentioned, below are additional broker-dealers with whom AIM/INVESCO had established improper arrangements to push AIM/INVESCO Funds.

107.    FSC Securities Corporation represents financial advisors under the AIG group umbrella.  The firm's September 14, 2004 "FSC Disclosure Document for Mutual Fund and Variable Annuity Shareholders" indicates that AIM participated in "shelf space" arrangements with FSC.  *See* http://www.fscorp.com/EPProgramDisclosure.pdf.  According to the FSC Disclosure Document, AIM paid FSC an amount "in addition to the customary sales charges in connection with sales of mutual funds."  *Id.*  FSC Securities also disclosed that its individual brokers, as well as FSC Securities, are compensated by AIM such that it "may create an

36

incentive for representatives to sell such funds." *Id.* Furthermore, on sales of AIM Funds, FSC brokers did not have to pay a ticket charge, further increasing their compensation.

108.   FSC Securities disclosed that it also received compensation in the form of 12b-1 fees: "12b-1 fees are payments made by a mutual fund in connection with a distribution of its securities. The fund company takes 12b-1 fees out of the fund's assets each year for marketing and distribution expenses, which may include compensating representatives." *Id.* (Emphasis added.)

109.   In a June 2004 press release on the Smith Barney website entitled "Mutual Funds, Revenue Sharing Fund Families," Smith Barney, a division of Citigroup Global Markets Inc. ("CGMI"), identified that the AIM Funds made payments to Smith Barney as part of a "shelf space" arrangement. *See* http://www.smithbarney.com/products_services/mutual_funds /investor_information/revenueshare.html. According to AIM/INVESCO internal documents, AIM Defendants agreed to pay bps on Class A, B and C share sales. In 2001, AIM ranked in the top 10 in Smith Barney's sales of mutual funds, with $350 million in sales. As for the affiliated broker dealers of CGMI, Citicorp Investment Services and PFS Investments Inc., AIM similarly agreed to pay bps on Class A, B and C share sales. They also paid a significant additional payment for meeting support as part of the sales and assets arrangements.

110.   AIM also entered into a shelf space arrangement with Chase Investment Services Corporation ("Chase"). According to AIM/INVESCO internal documents, in a 2002 agreement with Chase, AIM agreed to pay brokerage commissions to Chase – in bps for sales of mutual funds, as well as bps on assets under management. Chase also paid cash for special meetings. AIM ranked in the top 5 in Chase's mutual fund sales with sales of $150 million.

111.    According to AIM/INVESCO internal documents, in 2001 AIM also agreed to pay bps on sales to Merrill Lynch, and bps on assets that were 13 months old and greater than $10 billion.

112.    On its website, National Planning Holdings, Inc. ("NPH"), a full service broker-dealer, revealed that it had "entered into agreements" with AIM "who provide the BDs [broker-dealers] with marketing and other services and who also provide the BDs with additional compensation." *See* http://www.siionline.com/public/sii_disclosure.pdf. As a result, AIM paid NPH's brokers bps on gross sales of AIM Funds. In addition, AIM paid bps on the amount of AIM assets under management by NPH brokers on an annual basis. Finally, AIM paid NPH a significant amount per year under the program.

113.    According to AIM/INVESCO internal documents, AIM also entered into shelf space arrangements with Bank of America where it would pay bps on Class A, B and C shares, bps on assets as of year-end 2001, and bps on new assets accrued after the start of 2002. These arrangements resulted in significant increases in AIM/INVESCO Fund shares which soared from $1 million in 2000 to $89 million in 2001 at Bank of America.

114.    Wachovia Securities has also identified on its website that it received payments from AIM as part of a "shelf space" arrangement. *See* http://www.wachovia.com/files /Mutual_Fund_Guide2.pdf. AIM/INVESCO internal documents note that AIM agreed to pay bps with Soft Dollars for sales of the funds and for assets under management. In 2001, Wachovia had $270 million in AIM/INVESCO Fund sales.

115.    On June 8, 2005, the NASD issues a press release entitled "NASD Charges 15 Firms with Directed Brokerage Violations, Imposes Fines Totaling More than $34 Million." Among the firms fined was H.D. Vest Investment Services, who was fined $4 million for

"operat[ing] 'preferred partner' or 'shelf space' programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage. The benefits to mutual fund complexes of these quid pro quo arrangements included, in various cases, higher visibility on the firms' internal websites, increased access to the firms' sales forces, participation in 'top producer' or training meetings, and promotion of their funds on a broader basis than was available for other funds." *Available at* www.nasd.com/web/idcplg?IdcService=SS_GET_PAGE &ssDocName=NASDW_014340 (the "NASD June 8, 2005 Press Release"). The NASD went on to note that:

> The fine imposed on H.D. Vest Investment Services included charges related to violations of NASD rules relating to non-cash compensation. H.D. Vest reimbursed brokers' expenses incurred in connection with certain firm training and educational conferences based, in part, on the brokers' sales of funds that participated in its preferred partner program - instead of giving equal weight to the sales of all mutual funds, as required by NASD rules.

*Id.* AIM Investments is identified as one of H.D. Vest's preferred partners.

116.   AIM also entered into similar agreements with Deutsche Bank, Fidelity, ING, Financial Network, IFG, Locust St. Securities, Multi-Financial, Prime Vest, Vestax, Washington Square, Prudential Securities, UBS, Wells Fargo Funds and State Street Global Markets, LLC.

**Excessive Investment Adviser Fees To Pay For Revenue Sharing**

117.   Defendants charged investors inflated advisory fees to pay part of their revenue sharing agreements. However, these fees should have been subject to Rule 12b-1 since they dealt with distribution. Advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, where the investment adviser and its affiliates claim to make payments from their own profits, are regulated under Rule 12b-1 and Section 36(b). As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in

which the adviser makes distribution related payments out of its own resources.... 'if *any allowance* were made in the investment adviser's fee to provide money to finance distribution.'" Securities Exchange Commission, SEC-Reply-1, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing *Payment of Asset-Based Sales Loads By Registered Open-Ended Management Investment Companies*, Investment Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988) (emphasis added). Defendants paid for part of these revenue sharing arrangements through advisory fees to circumvent sales limits placed on distribution.

**Defendants Used Rule 12b-1 Distribution Fees For Improper Purposes**

118.    Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) (15 U.S.C. 80a-35(a) and

(b)) of the Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. 270.12b-1.

119.    The exceptions to the Rule 12b-1 prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors.

120.    During the Class Period, the Director Defendants authorized, and the Investment Adviser Defendants and Distributor Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees. However, the purported Rule 12b-1 fees charged to AIM/INVESCO Fund shareholders were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the Funds were marketed and the number of Fund shareholders increased, the economies of scale thereby created, if any, were not passed on to AIM/INVESCO Fund shareholders, but were used to benefit the Investment Adviser Defendants and their affiliates.

121.    The absence of any benefit from economies of scale is illustrated when looking at the expense ratio of funds who have increasing assets. For example, despite the fact that net assets for the AIM Basic Balanced Fund increased from $10.753 million in 2001 to $53.675 million in 2003, the net asset value per share of the fund decreased from $10.00 per share to $9.46 per share. Yet, during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets jumping from 1.43% to 1.50%.

122.    Moreover, Defendants failed to impose any 12b-1 breakpoints - *i.e.* reductions in 12b-1 fees - as the assets of the Funds increased. The concept behind breakpoints is that as fund

assets increase, certain fixed costs remain the same, thereby reducing the overall costs per shareholder. Despite this fact, Defendants failed to impose 12b-1 breakpoints for payments that should not have increased as the size of the Fund assets increased.

123. This increase in fees while the net asset value decreased, and the failure to grant any breakpoints with costs being fixed, were red flags for the Director Defendants alerting them that they should re-evaluate these fees. If anything, the AIM/INVESCO Funds' marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. The Director Defendants ignored or failed to review written reports of the amounts expended pursuant to the AIM/INVESCO Funds Rule 12b-1 plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plan, even though such payments not only harmed existing AIM/INVESCO Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective AIM/INVESCO Funds investors.

124. As discussed throughout this Complaint and below, in violation of Rule 12b-1, Defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the AIM/INVESCO Funds Rule 12b-1 plan.

**Defendants' Improper Use of Excessive Commissions and Directed Brokerage Business**

125. The Investment Adviser Defendants and Distributor Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into AIM/INVESCO Funds as part of the many *quid pro quo* "shelf space" arrangements between AIM and INVESCO and various brokerage firms. Such payments were used to fund sales contests and other undisclosed financial incentives to further push AIM/INVESCO Funds.

These incentives created an undisclosed conflict of interest and caused brokers to steer clients to AIM/INVESCO Funds regardless of the Funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty. As described by the National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses commissions payable for executing the fund's securities trades to obtain a preferred position for the fund in the broker-dealer's distribution network. This practice creates numerous potential conflicts of interest, including possible incentives for broker-dealers to base their fund recommendations to customers on brokerage commission considerations rather than on whether a particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

126.   In addition to corroding the broker-investor relationship, Defendants' misuse of directed brokerage commissions to pay for the shelf space arrangements decreased the transparency of the fund costs to advisers. Directed brokerage does not show up as an expense, but is merely reflected as a decrease in investors' returns. The Investment Adviser Defendants took advantage of the opaqueness of this form of payment to circumvent 12b-1 fee limits placed by the NASD.

127.   By paying the excessive commissions and directing brokerage business to participate in "shelf space" programs, the Investment Adviser Defendants and Distributor Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan. Additionally, in several actions to date against brokerage firms and mutual fund advisors, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf space" programs – as AIM and INVESCO have done here – are improper.

128.    The excessive commissions and directed brokerage business used by AIM/INVESCO did not fund any services that benefited the AIM/INVESCO Funds shareholders. This practice materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees were taken. In fact, the Investment Adviser Defendants and their affiliates profited from this improper use of fund assets because it resulted in an increase in the size of the Funds and, thus, the size of their asset-based fees. Their receipt of compensation bore no reasonable relation to the "services" they rendered. Furthermore, Defendants paid more with investor's commissions than they would have paid with hard cash.

129.    As explained at the October 22, 2000 INVESCO Funds board meeting in which Defendants Lawrence H. Budner, Bob R. Baker, James T. Bunch, John W. McIntyre, Fred A. Deering and Mark H. Williamson were all present (the "October 22, 2000 Board Meeting"), "there is no source other than brokerage which can be used by INVESCO to encourage brokerage firms to provide INVESCO with favored status." The discussion went on to explain that the "additional amount of brokerage, although small, would be of **great benefit to INVESCO** ... a small increase in brokerage directed to a given firm **will increase INVESCO's priority standing with that firm.**" (Emphasis added).

130.    When Defendants negotiated to direct brokerage commissions to pay for these shelf space arrangements, they sometimes negotiated to direct brokerage commissions of 1.5 times (or some other negotiated multiple or conversion rate) the amounts requested by broker dealers. This means that if AIM/INVESCO was obligated to pay, pursuant to a revenue sharing arrangement with a broker dealer, $100,000 in cash to the broker dealer for fund sales, the broker dealer would allow AIM/INVESCO to satisfy the arrangement with $150,000 in brokerage commissions. According to an AIM/INVESCO internal memorandum, AIM/INVESCO

44

negotiated such agreements with such broker dealers as Morgan Stanley, Bank of America and Wachovia.

131.    According to recent disclosures by Linsco/Private Ledger Corp. on its website, AIM Investments is one of the fund families that is part of the revenue sharing program referred to as "LPL's Sponsorship Program." On June 8, 2005, Linsco/Private Ledger Corp. was fined over $3.6 million by the NASD for directed brokerage violations, where it accepted directed brokerage to satisfy revenue sharing arrangements. The NASD found that Linsco/Private Ledger was one of many broker-dealers that operated shelf space programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage.

132.    According to the NASD press release:

> The retail firms generally monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations. The use of directed brokerage allowed the fund complexes to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations.

See NASD June 8, 2005 Press Release.

133.    Piper Jaffray was another firm fined by the NASD on February 22, 2005 for directed brokerage after which it began to disclose the fund families with which it had arrangements. The disclosure includes AIM as one of the fund families with which it had a revenue sharing agreement. The NASD found that Piper Jaffray operated "preferred partner" or "shelf space" programs, giving favorable treatment to funds offered by certain mutual fund companies in return for brokerage commissions and other payments. That special treatment included higher visibility on the firms' internal websites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a

broader basis than was available for other funds. *See* NASD Fines Quick & Reilly, Piper Jaffray

$845,000 For Directed Brokerage Violations (Feb. 22, 2005) annexed hereto as Exhibit C.

134.    That conduct violated the NASD's "Anti-Reciprocal Rule," which prohibits firms

from favoring the sale of shares of particular mutual funds on the basis of brokerage

commissions.  Piper Jaffray, which operated its preferred partner program from 1998 to 2003,

included only 21 fund complexes in the program (including AIM), but sold funds offered by

more than 100 fund complexes.  The participating mutual fund companies paid Piper Jaffray

extra fees in addition to regular sales fees.  "Piper Jaffray negotiated those extra payments with

mutual fund companies each year, asking for minimum payments of $100,000 to $125,000.

Some fund complexes paid a flat fee; others paid amounts based on a percentage of gross fund

sales and the average daily assets under management for the fund complex." *See* Exhibit C.

135.    The SEC has expressed serious concerns regarding the significant conflicts of

interest inherent in revenue sharing programs and has mandated that proper disclosure must be

made.  Specifically, the SEC has stated that "[r]evenue sharing arrangements not only pose

potential conflicts of interest, but also may have the indirect effect of reducing investors' returns

by increasing the distribution-related costs incurred by funds.  Even though revenue sharing is

paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is

possible that some advisers may seek to increase the advisory fees that they charge the fund to

finance those distribution activities . . . Moreover, revenue sharing arrangements may prevent

some advisers from reducing their current advisory fees."  Confirmation Requirements and Point

of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities,

and Other Confirmation Requirement Amendments, and Amendments to the Registration Form

for Mutual Funds, 69 Fed. Reg. 6438, 6441, n.21 (Feb. 10, 2004) (to be codified at 17 C.F.R.

Parts 239, 240 and 274).  The Morgan Stanley revenue sharing programs that the SEC declared

improper included both cash payments made ostensibly by the distributor or adviser, as well as

payments through directed brokerage.

136.    The SEC has brought actions against other mutual fund companies for the same

type of behavior complained of here.  As established in a recent Administrative Proceeding

against Massachusetts Financial Services, Inc. ("MFS") for similar practices complained of

herein:

> **MFS Did Not Adequately Disclose to MFS Shareholders that it**
> **Allocated Fund Brokerage Commissions to Satisfy Strategic**
> **Alliances.**
>
> *             *             *
>
> Specifically, Item 16(c) of the Form N-1A requires a description in
> the SAI of "how the Fund will select brokers to effect securities
> transactions for the Fund" and requires that "[i]f the Fund will
> consider the receipt of products or services other than brokerage or
> research services in selecting brokers, [the Fund should] specify
> those products or services."
>
> *             *             *
>
> **The SAIs did not adequately disclose to shareholders that MFS**
> **had entered into bilateral arrangements in which it agreed to**
> **allocate specific negotiated amounts of fund brokerage**
> **commissions, subject to best execution, to broker-dealers for**
> **"shelf space" or heightened visibility within their distribution**
> **systems.**

*See* March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings,

Making Findings and Imposing Remedial Sanctions against MFS, File No. 3-11450, *available at*

http://www.sec.gov/litigation/admin/ia-2224.htm.  (Emphasis added.)

137.    Similarly, in its Administrative Proceeding against Morgan Stanley, the SEC

explained:

> At issue in this matter are two distinct disclosure failures. The first
> relates to Morgan Stanley DW's operation of mutual fund
> **marketing programs in which it collected from a select group
> of mutual fund complexes amounts in excess of standard sales
> loads and Rule 12b-1 trail payments. These programs were
> designed to specially promote the sale of those mutual funds
> with enhanced compensation to individual registered
> representatives, known as financial advisors ("FAs"), and
> branch managers as well as increased visibility in its extensive
> retail distribution network.**

*See* the November 17, 2003 Cease-and-Desist Order (footnote omitted) (emphasis added).

138.    On September 15, 2004, mutual fund advisor PIMCO and its affiliates entered

into a settlement with the SEC.  Similar to the allegations in this Complaint against AIM and

INVESCO, the SEC charged PIMCO entities with failing to disclose their use of directed

brokerage to pay for "shelf space" at brokerage firms.  The Press Release stated:

> The Securities and Exchange Commission announced today a
> settled enforcement action against the investment adviser, sub-
> adviser, and principal underwriter and distributor for the PIMCO
> Funds Multi-Manager Series funds (the PIMCO MMS Funds). The
> suit charges the entities with **failing to disclose to the PIMCO
> MMS Funds' Board of Trustees and shareholders material
> facts and conflicts of interest that arose from their use of
> directed brokerage on the PIMCO MMS Funds' portfolio
> transactions to pay for "shelf space" arrangements with
> selected broker-dealers.**
>
> *            *            *
>
> Stephen M. Cutler, Director of the SEC's Division of Enforcement,
> stated, "An investment adviser's undisclosed use of mutual fund
> assets to defray the adviser's, or an affiliated distributor's, own
> marketing expenses is a breach of the adviser's duty. Our action
> today — like the action brought by the Commission against
> Massachusetts Financial Services Company some six months ago
> — demonstrates the Commission's resolve to ensure that mutual
> fund shareholders know how their money is being spent."

*See* Press Release, U.S. Securities and Exchange Commission, SEC Charges PIMCO Entities

with Failing to Disclose Their Use of Directed Brokerage to Pay for Shelf Space at Brokerage

Firms, (Sept. 15, 2004) (on file with author), *available at* http://www.sec.gov/new/press/2004-130.htm  (emphasis added).

139.   On December 13, 2004, the SEC announced a settlement of charges against mutual fund investment adviser Franklin Advisers, Inc. and Franklin Templeton Distributors (collectively "Franklin") "alleging that Franklin, without proper disclosure, used fund assets to compensate brokerage firms for recommending the Franklin Templeton mutual funds over others to their clients."  The SEC press release continued:

> This practice is known as compensating brokerage firms for "shelf space."  As part of the settlement, Franklin agreed to pay $1 in disgorgement and a $20 million penalty as well as undergo certain compliance reforms.
>
> *       *       *
>
> The use of brokerage commissions to compensate brokerage firms for marketing created a conflict of interest between FA and the funds because FA benefited from the increased management fees resulting from increased fund sales.  Mutual funds that follow this practice of using brokerage commissions for marketing have an incentive to do their fund portfolio trading through brokerage firms that might not be the best choice for fund shareholders.  FA was required, but failed, to disclose adequately the arrangements to the boards so they could approve this use of fund assets, and to shareholders so they could be informed when making investment decisions.

*See* Press Release, U.S. Securities and Exchange Commission, Franklin Advisers and Franklin Templeton Distributors to Pay $20 Million to Settle Charges Related to Use of Brokerage Commissions to Pay for Shelf Space, (Dec. 13, 2004) (on file with author), *available at* http://www.sec.gov/news/press/2004-168.htm.

140.   On December 22, 2004, the SEC, NASD, and NYSE announced settled enforcement proceedings against Edward D. Jones & Co., L.P. ("Edward Jones") "related to allegations that Edward Jones failed to adequately disclose revenue-sharing payments that it

received from a select group of mutual fund families that Edward Jones recommended to its

customers." As part of the settlement, Edward Jones paid $75 million in disgorgement and civil

penalties. The press release continued:

> Linda Chatman Thomsen, Deputy Director of the Commission's
> Division of Enforcement, said, "Edward Jones' undisclosed receipt
> of revenue sharing payments from a select group of mutual fund
> families created a conflict of interest. When customers purchase
> mutual funds, they should be told about the full nature and extent
> of any conflict of interest that may affect the transaction. Edward
> Jones failed to do that."
>
> *     *     *
>
> In NASD's separate settlement, in addition to the receipt of direct
> revenue sharing payments, NASD found that the firm gave
> preferential treatment to the Preferred Funds in exchange for
> millions of dollars in directed brokerage from three of the
> Preferred Fund families. This violates NASD's 'Anti-Reciprocal
> Rule," Conduct Rule 2830(k), which prohibits regulated firms
> from favoring the distribution of shares of particular mutual funds
> on the basis of brokerage commissions to be paid by the fund
> companies.

*See* Press Release, U.S. Securities and Exchange Commission, Edward Jones to Pay $75 Million

to Settle Revenue Sharing Charges, (Dec. 22, 2004) (on file with author), *available at*

http://www.sec.gov/news/press/2004-177.htm.

141.    Further illustrating that the NASD views revenue sharing programs as improper

and impermissible, a February 16, 2005 press release regarding the NASD's filing of a complaint

against American Funds Distributors states:

> American Funds Distributors, Inc. [ ] violat[ed] NASD's Anti-
> Reciprocal Rule by directing approximately $100 million in
> brokerage commissions over a three-year period to about 50
> brokerage firms that were the top sellers of American Funds.
>
> *     *     *
>
> The commissions were payments for executing trades for the
> American Funds' portfolio that were directed to the brokerage